**Wang Zong XIAO, Plaintiff,**

v.

**Janet RENO, in her capacity as Attorney General of the United States; Michael J. Yamaguchi, in his capacity as United States Attorney for the Northern District of California; Reginald L. Boyd, in his capacity as United States Marshal for the Northern District of California; Chris Sales, in her capacity as Acting Commissioner of the Immigration and Naturalization Service; and David Ilchert, in his capacity as District Director for the Immigration and Naturalization Service, Defendants.**

No. C–90–0350 WHO.

United States District Court,
N.D. California.

Oct. 6, 1993.

**1510**

Foerster, San Francisco, CA, Paul M. Gordon, Law Offices of Paul M. Gordon, Oakland, CA, for plaintiff.

John A. Mendez, U.S. Atty., Stephen L. Schirle, Chief, Civil Div., Alberto E. Gonzalez, Sp. Asst. U.S. Atty., San Francisco, CA, Mark C. Walters, Asst. Director, Michele Y.F. Sarko, Alexander H. Shapiro, Attys., Office of Immigration Litigation, Civil Div., Dept. of Justice, Washington, DC, for defendants.

Cedric C. Chao, John D. Danforth, Ruth N. Borenstein, Lisa Bradley, Morrison &

## TABLE OF CONTENTS

| | Page |
|---|---|

I. INTRODUCTION .................................................... 1511
II. FINDINGS OF FACT ............................................... 1512
 A. The Goldfish Arrests. ......................................... 1512
 B. The Commencement of the Goldfish Case. ...................... 1514
 C. The Prosecution Team's *May 1988* Trip ....................... 1520
 D. Wang's *September 1988* Trip to San Francisco. ................ 1522
 E. The Prosecution Team's *March 1989* Trip. .................... 1526
 F. The *September 1989* Trip to Shanghai. ....................... 1532
 G. The Goldfish Trial. .......................................... 1534
 H. The Immigration Proceedings. ................................ 1538
 I. Wang's Prospects if He is Returned to the PRC. ............... 1541
III. CONCLUSIONS OF LAW .......................................... 1544
 A. Jurisdiction. ................................................ 1544
 1. Exhaustion of Administrative Remedies. ................... 1544
 2. Political Questions Doctrine. ............................. 1546
 B. Third Cause of Action: Violation of Substantive Due Process. ... 1547
 1. Wang's Constitutional Rights Apply to Conduct while He Was in the PRC and as an Alien. ...................................... 1547
 2. Wang has the Right to be Free from Governmental Conduct that "Shocks the Conscience". ..................................... 1550
 a. The Government Acted With Deliberate Indifference to Wang's Rights. .................................................. 1551
 (i) The Government Ignored Clear Indications that the PRC Police Coerced Parts of Wang's Testimony. ............... 1551
 (ii) The Government Attempted to Prevent the PRC from Transferring Wang to the Chinese Court System Until After He Testified in the United States. ................ 1553
 (iii) The Government Ignored Problem of Using Wang as a Witness When Prosecution was Declined in Hong Kong.... 1553
 (iv) The Government Deliberately Failed to Consider the Wang Videotape. ......................................... 1556
 (v) The Government Failed to Prepare PRC Officials for Cross–Examination. ...................................... 1556
 (vi) The Government Deliberately Failed to Advise PRC Wang Could Apply for Asylum. ............................... 1557
 (vii) Swenson Lied to the Court About His Knowledge of PRC Mistreatment of Wang. ................................. 1557
 (viii) After Wang Testified, Swenson Tried to Cover Up His Failings in the Case. ................................... 1558
 (ix) INS Tried to Derail Wang's Asylum Application ........... 1558
 b. Actions of the Government "Shocks the Conscience" of the Court.... 1559

Page

C. Fourth Cause of Action: Violation of the Government's Duty to Protect Its Witnesses. ......................................................... 1559
D. Fifth Cause of Action: Failure to Use Ordinary Care. ................... 1560
E. Sixth Cause of Action: Equitable Estoppel Based on Affirmative Governmental Misconduct. ....................................................... 1560
F. Seventh Cause of Action: Violation of 18 U.S.C. § 3508. ................ 1561
G. Eighth Cause of Action: As Applied Violation of Procedural Due Process.... 1562
H. Ninth Cause of Action: Facial Violation of Procedural Due Process. ..... 1562
I. Tenth Cause of Action: Violation of 8 U.S.C. § 1182. ................... 1562
J. Twelfth Cause of Action: Violation of the Law of Nationals and International Law. ............................................................... 1563
K. Remedy. ............................................................... 1563
IV. ORDER. ................................................................. 1564

## OPINION AND ORDER

ORRICK, District Judge.

### I. INTRODUCTION.

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), *overruled on other grounds, Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

Plaintiff, Wang Zong Xiao ("Wang"), a citizen of the People's Republic of China ("PRC" or "China"), claims he is a victim of a prosecutorial effort conducted in violation of the above canons enunciated by the Supreme Court. Wang filed this lawsuit against the Attorney General of the United States, the United States Attorney for the Northern District of California, the Marshal for the Northern District of California, the Commissioner of the Immigration and Naturalization Service ("INS"), and the INS District Director (collectively "defendants" or "government"), seeking to bar the United States government from returning him to the PRC, where, Wang insists, he faces the death penalty as punishment for providing truthful testimony in an American court of law. The gravamen of Wang's first amended complaint is that the government deprived him of the substantive due process of law that the Constitution of the United States guarantees.

Plaintiff's first amended complaint, filed July 5, 1990, stated twelve causes of action. In accordance with the Ninth Circuit's opinion in *Wang Zong Xiao v. Barr,* 979 F.2d 151 (9th Cir.1992), this Court, by Memorandum Decision and Order ("Memorandum Decision") filed March 2, 1993, dismissed Wang's eleventh cause of action. Wang's remaining causes of action are for injunctive relief pending final adjudication of asylum application (including federal judicial review), injunctive relief pending final adjudication of asylum application (including federal judicial review), violation of substantive due process, violation of the government's duty to protect its witnesses, breach of the government's duty to exercise ordinary care, equitable estoppel based on affirmative governmental misconduct, violation of 18 U.S.C. § 3508, violation of procedural due process (alleging that § 3508 is unconstitutional as applied to Wang), violation of procedural due process (alleging that § 3508 is unconstitutional as applied to any prisoner from the PRC), violation of 8 U.S.C. § 1182, and violation of the law of nations and international law.

After almost three years of extensive discovery, the Court conducted a thirteen-day trial on Wang's causes of action. The Court hereby sets forth its Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any Findings of Fact are included under Conclusions of Law, they shall be deemed Findings of Fact; and to the extent that any Conclusions of Law are included under Findings of Fact, they shall be deemed Conclusions of Law.

The facts show such clear, flagrant, and shameful violations of Wang's rights under the Constitution that they "shock the conscience" of the Court and deny Wang the due process to which he is entitled. The facts also warrant the exercise of the Court's inherent supervisory power to protect the witnesses appearing before it. To remedy the constitutional violations, and to protect Wang from certain torture and probable death, the Court enjoins defendants from taking any action to return Wang to the custody of the PRC or its representatives.

For jurisdictional reasons, the Court determines that defendants are entitled to judgment on Wang's remaining causes of action.

## I. FINDINGS OF FACT.

### A. The Goldfish Arrests.

On March 12, 1988, at approximately 2:00 p.m., PRC police officials arrested Wang on the streets of Shanghai. Four men approached Wang, kicked him, and dragged him along in the street and into a waiting car; once in the car, Wang was blindfolded, kicked again, and sworn at by the arresting officers. Wang knew he was being arrested for his participation in a heroin transaction.

The officers took Wang to the Chang–Ning Branch of the Shanghai Public Security Bureau ("PSB"); they left Wang in an office with three or four men in plain clothes for approximately two hours. During that time, these men hit and kicked Wang, and also used an electric cattle prod to shock him several times. Wang was handcuffed throughout this two-hour beating.

At approximately 5:00 p.m. that same day, the police took Wang to an interrogation room. The physical layout of the room was as follows: Wang was seated alone in a chair in the center of the room; Wang's interrogators sat behind a desk; that desk was atop a raised platform at one end of the room; at least three men sat behind the desk and asked Wang questions while a woman seated with them took notes. The men proceeded to tell Wang of something they referred to as the Communist Party policy: if Wang told the officers everything, he would receive leniency; if he refused to speak, he would be treated with severity. At some point after this, Zhu Yi–Zhong ("Zhu"), the Deputy Chief of the Division of Preliminary Hearing in the PSB, entered the interrogation room and told Wang that people had been arrested in Hong Kong and the United States in connection with "the goldfish." The officers thereafter proceeded to question Wang about the underlying facts of a conspiracy to ship heroin to the United States.

This interrogation session lasted from 5:00 p.m. until 10:00 p.m. The questioning was interrupted several times. When the officers would take a break from questioning Wang, two young men would approach him, kick him, and shock him with a cattle prod. The officers reminded Wang of the party policy (cooperate and receive leniency, remain silent and receive severe treatment) repeatedly throughout the five-hour interrogation.

At approximately 10:00 p.m., Wang was taken by car to the "No. 1 Detention House" in Shanghai. Officers took Wang to another interrogation room where the physical layout was nearly identical to that of the interrogation room at the Chang–Ning Branch. The questioners in this room included Zhu, Huang Zushing ("Huang"), Chief of the PSB's Preinterrogation Division, and two other men who shared the name "Wang." During this second interrogation, no more than seven or eight officers were in the room at any one time. A female officer again took notes; one of the officers named Wang also took notes. The second interrogation was much more lengthy than the first; the officers questioned Wang until around 7:00 a.m. the following morning. The conditions, however, were hardly more pleasant. Wang was forced to stand for up to an hour at a time;

despite his requests to sleep, officers would shake him if he fell asleep even for a few minutes; he was given nothing to eat or drink; when he asked for water, the officers reproached him, asking "what kind of place do you think you're in?"

Zhu and one of the officers named Wang both threatened plaintiff Wang that in the event he did not cooperate, he would be shot. One of the officers said to Wang, "you're like a piece of meat on our chopping board; we can chop you any way we want." Although Wang suffered verbal abuse, none of the officers physically struck him during the second interrogation. The seven or eight officers in the room took turns asking Wang questions about a delivery of heroin to San Francisco.

The second interrogation lasted throughout the night and into the early hours of the following morning, March 13, 1988. At approximately 7:00 a.m., officers took Wang to a detention cell where he slept on the floor for about an hour. He awoke to be shocked again by a cattle prod. Wang was then taken to a third interrogation, which lasted from around 9:00 a.m. until 7:00 p.m. Wang was sometimes seated and sometimes standing during this interrogation. He was given lunch, and when officers returned him to his detention cell, he was given dinner. After this dinner break, the officers took Wang back to the interrogation room, where the questioning continued until 2:00 or 3:00 a.m. the following morning, March 14.

This pattern of interrogations continued for close to a month, with interruptions of only one or two days a week. On at least five occasions, the interrogations of Wang were videotaped; during each interrogation session, at least one PRC police official would take notes.

While the structure and frequency of the interrogations remained constant during this period, Wang's answers did not. The PRC officials told Wang they knew he had received a shipment of heroin. They asked Wang who it was that delivered heroin to the factory where he worked. On March 13, Wang gave the police two names, neither of

which was Liang De Lun.[1] Indeed, Wang told the police he had never seen either of the two individuals who delivered the heroin to the factory; he did, however, tell the police that he had spoken with Liang prior to the delivery, and that Liang was responsible for sending the two men with the heroin to Shanghai.

The PRC police officials were not satisfied with this response. One of them told Wang that he had not provided sufficient evidence to prosecute Liang. The police also made it clear to Wang that if he would say that Liang was present at the delivery, there would be no misunderstanding regarding where the heroin came from: it would be clear that it came from Hong Kong rather than from mainland China.

After several days of interrogations, Wang changed his story. He told the PRC police officials that Liang *was* present when the heroin was delivered. It is not clear when exactly Wang changed his version of events, but he did sign an interrogation statement on April 21, 1988, that placed Liang at the scene of the delivery. All told, the PRC police interrogated Wang more than thirty times from the time of his arrest on March 12, through April 21.

Wang continued to suffer physical abuse after April 21, 1988. The interrogations, for the most part, ceased. From March 12 through December 1989, when Wang came to the United States to testify, he was held incommunicado at the No. 1 Detention House. He left there on one occasion in September 1988, when he traveled to the United States to execute an affidavit in support of an extradition request. *See* Section D, *infra.* At one point, Wang was placed in an isolation cell for several days because the officers suspected him of smoking a cigarette. The eight-character Chinese phrase discussed above ("if you cooperate, you will receive leniency; if you do not, then you will be treated severely") appeared on the wall of every interrogation room that Wang saw in the No. 1 Detention House.

From the perspective of reports prepared by the United States government, Wang's

---

1. Liang De Lun also is referred to herein as Leung Tak Lun, one of the Goldfish defendants.

treatment is not substantially different from the way many criminal suspects are treated while incarcerated in the PRC. For example, the Department of State's "Country Reports on Human Rights Practices for 1987" includes the following statements regarding the PRC's criminal justice system:

> There are credible reports that public security personnel sometimes use harsh treatment at the time of detention. . . .
>
> . . . .
>
> Although Chinese law details a series of procedures to be observed in the handling of suspects, including use of arrest warrants and time limits for detention during investigation and trial, such safeguards frequently are ignored in practice. . . .
>
> . . . .
>
> In practice . . . people have been detained for long periods without being charged or told the reasons for their detention. . . .
>
> . . . .
>
> Most Chinese trials are essentially sentencing hearings at which defense representatives plead for clemency for their clients and, with few exceptions, do not contest their guilt. . . . Courts assume the guilt of any person brought to trial. . . .

(Ex. 370 at 662–64.)

Wang's treatment in the PRC police system—his detention without trial, his forced confessions, and the physical and mental torture exerted upon his person—is consistent with the treatment of many other prisoners in the PRC.[2] That the PRC police interrogated Wang many times, and forced him to give multiple confessions, is consistent with the purposes of the PRC's criminal justice system to force the individual suspected of wrongdoing to cooperate with the state. *See* Section I, *infra.*

### B. *The Commencement of the Goldfish Case.*

For the United States Attorney's Office for the Northern District of California and the Drug Enforcement Administration ("DEA") San Francisco Field Office, what now is known as the "Goldfish" case first came to light in early March 1988. DEA Special Agent Thomas Aiu learned from his supervisor, Carter Osleber, that authorities in the PRC had intercepted a shipment of heroin, concealed in the cavities of dead goldfish, bound for San Francisco.

On March 8, 1988, PRC law enforcement officials had contacted Jonathan Aloisi, the Narcotics Coordinator in the American Embassy in Beijing, and liaison between the Hong Kong DEA office and the PRC's Ministry of Public Security ("MPS"), to notify him of the shipment. (Ex. 29 ¶ 1.) Aloisi then contacted Brad Morgan, a DEA agent stationed in Hong Kong. Morgan then asked Aloisi to investigate whether the Chinese would participate in a "controlled delivery" of heroin. (*Id.* ¶ 6.)

Aiu asked for, and received, approval from Assistant United States Attorney Eric Swenson to place a "beeper" inside a controlled delivery of heroin from Shanghai to San Francisco. Swenson, who has been an Assistant United States Attorney since November 1975, and who has handled narcotics matters since 1978, authorized the placement of the beeper.

The controlled delivery was made on May 10, 1988, and arrests followed thereafter in Hong Kong, China, and San Francisco; among those arrested in China was Wang. *See* Section A, *supra.* At some point in March 1988, both Swenson and Aiu learned of Wang's arrest in China. Aiu also knew of two suspects in Hong Kong who were central to the conspiracy to import heroin, namely, Chico Wong, who was a United States citizen and who had been released on detention bail, and Liang, aka Leung Tak Lun, whom Aiu viewed as the "mastermind" of the drug smuggling operation and whom Hong Kong authorities were holding in custody.

---

**2.** The Court bases its findings on Wang's treatment at the hands of the PRC police on Wang's own testimony, which the Court finds credible. The Court bases its finding that Wang's treatment was not unusual, as compared to other persons arrested in the PRC, in part on the testimony of Professor Robert Berring, whom the Court certified as an expert witness. (Tr., Apr. 5, 1993, at 54:19–21.) The Court certified Dr. Ross Terrill, Wang's other expert witness, on matters related to the PRC. (Tr., Apr. 26, 1993, at 1349:22–25.) The Court also certified Professor James Feinerman, defendants' expert witness on such matters. (*Id.* at 1305:15.)

On March 14, 1988, the American Embassy in Beijing sent a cable to the Department of State and to the DEA in San Francisco, containing the following summary of the controlled delivery and the cooperation between the United States and the PRC:

The Chinese Ministry of Public Security has arrested two individuals in Shanghai and the Hong Kong authorities have arrested two Hong Kong citizens in connection with the attempt ... to ship heroin to San Francisco from Shanghai. The PRC agrees that this cooperative effort between the Chinese and the Americans should be well-publicized, but emphasize [sic] that we need to coordinate to ensure that the news is released simultaneously in the US, Hong Kong, and the PRC....

2. The Ministry of Public Security (MPS) informed us today (March 14) that they have made arrests in the heroin shipment case. On March 12 at approximately 1500 the Shanghai public security authorities arrested Wang Zongxiao and his associate Liang Junhua in Shanghai. At approximately 2045 on March 12 authorities in Hong Kong arrested two Hong Kong citizens, Liang Delun and his wife Ma Xingying. MPS officials said that on January 20 *Liang Delun sent two as yet unidentified individuals to Guangzhou to deliver 4684 grams of heroin to Wang Zongxiao,* thus setting in train the events leading to the MPS seizure of heroin on March 9 in Shanghai.

(Ex. 30 ¶¶ 1–2 (emphasis added).) On March 16, 1988, the American Embassy issued another cable, which noted that the PRC was "urg[ing] Hong Kong and DEA in the U.S. to agree to simultaneous release of the news [of the arrests] ... on Thursday, March 17 (Beijing time)." (Ex. 31 ¶ 2.) The Embassy recommended that the United States agree to the PRC's request. (*Id.*) The joint press statement was released on March 17, 1988. (Ex. 32.)

In late March 1988, Aiu and Swenson learned that Hong Kong had decided not to prosecute the suspects under its control.

Aiu learned of the declination decision from Hong Kong Inspector Sandy Boucher. Aiu relayed the information to Swenson and to Osleber. Aiu did not prepare a file memorandum on Hong Kong's declination decision, and he is unaware to this day whether anyone within the DEA did prepare such a memorandum.

Around March 28, 1988, Boucher sent to DEA Hong Kong Country Attache James Harris eleven sets of "interrogation minutes," summaries of statements that suspects in the Goldfish conspiracy had given to police officials. Harris forwarded these minutes to Aiu and Swenson, who received them around April 1, 1988. Among the interrogation minutes Boucher sent were three for Wang. Although the prosecution team received seven other sets of interrogation minutes for Wang after the Goldfish trial commenced in January 1990, the three sent by Boucher were the only ones that Swenson or Aiu possessed for Wang prior to the start of trial.

The interrogation minutes identify the date and time of the questioning. Although the minutes Boucher provided were written in Chinese, Aiu and Swenson had those minutes translated into English, and the translated versions were introduced into evidence in this case. Aiu, Swenson, and Harris read all three sets of notes soon after receiving them. The earliest set of minutes is dated March 14, 1988. Swenson underlined and circled various words and phrases on the face of the minutes,[3] and also wrote comments in the margin. At one point during the questioning, the following exchange took place:

Question: When and in what way was the heroin delivered to you?

Answer: It was about ten odd days later that two males from Hong Kong, both of them aged about 20 to 30, carrying a hold-all, approached me. They told me, "Liang De Lun [i.e., Leung Tak Lun] has asked us to deliver these things to you." After they had left, I opened the hold-all and found [that] there were 9 packets of heroin packed in transparent

(Ex. 192 at 3–4; Ex. 195.)

---

**3.** Swenson also prepared a set of handwritten notes based on his reading of these statements.

plastic bags. I then placed them in my room first.

(Ex. 3 at 2–3.) The following words are written in next to Wang's answer: "Leung *not there.*" (*Id.* at 3.) Swenson wrote this note in the margin, and he also underscored the words "not there."

Two sets of interrogation minutes are dated March 19, 1988. The first is a set that indicates the interrogation of Wang commenced at 1:00 p.m. (Ex. 6 at 1.) One of the initial questions includes this statement: "As to the particular section of the 'Criminal Law' which you are guilty of, and the criteria governing the leniency or strictness with which this case is to be handled, you should know much about them *after so many interrogations have* been conducted on you." (*Id.*) Wang's response includes the words "I am very grateful to the comrades who handle this case, for the lessons they have taught me. *I have revealed all the facts about my crime.*" (*Id.* at 2.) The underscoring in both the question and Wang's response is Swenson's.

The following exchange is recorded further in this set of interrogation minutes; again, the underscoring is Swenson's:

Question: Go on revealing the facts.

Answer: In mid-January, I telephoned to [Hong Kong and] contacted Liang De Lun again. I asked him when he would come back to Guangzhou. Liang De Liang then told me over the telephone that two persons from Hong Kong had arrived at Guangzhou by then. He said, "I will go to Guangzhou tomorrow." He also asked me to go to meet [him] then. At [illegible] p.m. The next day, I met Liang De Lun at the Guangzhou Railway Station. We then took a taxi and went to the Oriental Hotel directly. Having arrived at the Oriental Hotel, Liang telephoned someone upstairs. Later, a person called "Ah Kun" came down and led me and Liang De Lun upstairs. Having gone upstairs, I saw that apart from Ah Kun, there were also a *Hong Kong guy of tall, thin build and and [sic] a Guangzhou guy of short build and dark complexion.* When Liang De Lun saw the Hong Kong guy

of tall, thin build, he seemed to have said to him, "your face sounds [*sic*] quite familiar." (It seemed that the two persons had come from the next room.) Liang asked whether they had brought along the "thing." The Hong Kong guy of tall, thin build said that the "thing" had been brought along. Liang then paid them HK 460,000 at once. As to the rem*aining $30,000 or $40,000,* Liang promised that he would pay it off when he had returned to Hong Kong. The Hong Kong guy of tall, thin build and the Guangzhou guy of short build and dark complexion then went away to fetch the goods immediately. *About 3 minutes later,* the two of them returned, carrying a black leather case. They then opened them [*sic*]. I saw that there were 7 blocks of heroin wrapped in yellow cellophane. Having seen them, Liang De Lun said, *"These are not Hong Kong goods, but rather Guangzhou goods."* The Hong Kong guy of tall, thin build then said, *"These are not Guangzhou goods. I have brought these goods here from Hong Kong."* I also heard they [sic] say that they were returning to Hong Kong at 9:00 p.m. that night by ship.

(*Id.* at 5.) The third set of interrogation minutes, also dated March 19, 1988, includes Wang's description of numerous telephone calls he placed to Liang De Lun during the course of the smuggling operation. (Ex. 8.) With the single exception of the eve-of-trial request discussed in Section G, *infra,* no member of the United States prosecution team asked any PRC police official whether there were additional interrogation minutes of Wang.

When Aiu reread these interrogation minutes in late April and early May 1988, he noticed a difference between Wang's statements on March 14 and his statements on March 19: only the latter statement placed Liang De Lun (or, as he was known to the United States prosecution team, Leung Tak Lun) at the scene of the heroin delivery. According to the March 19 statement, Liang was present in the room at the Oriental Hotel when "the Hong Kong guy" and "the

Guangzhou guy" opened the "black leather case," inside of which were seven "blocks of heroin wrapped in yellow cellophane." (Ex. 6 at 5.) The March 19 statement also places Liang at the scene when the blocks of heroin were "broken up" and turned into "powder." (*Id.* at 6.)

According to the March 14 statement, in contrast, Liang was not present when the heroin was delivered, a fact that Swenson noted with his comment in the margin. (Ex. 3 at 3.) The March 14 statement also is consistent with the March 14 cable from the Embassy in Beijing, stating that Liang "sent two as yet unidentified individuals" to Guangzhou to deliver the heroin. (Ex. 30 ¶ 2.)

As already noted, the change in Wang's story was not lost on Aiu. He knew that the later statement, given on March 19, was significantly more inculpatory of Liang, whom the prosecution team considered the "mastermind" of the smuggling operation. Aiu also recognized something else: that the PRC police probably had interrogated Wang many times, certainly more than the three sessions for which the prosecution team had minutes.

During this same time period, late April and early May 1988, Aiu made a connection between these two observations, that Wang's story had changed and that Wang, in all probability, had been interrogated on numerous occasions. Aiu thought that the change in Wang's testimony possibly had been brought about by what Aiu described as "unconventional" interrogation techniques. (Tr., Apr. 7, 1993, at 46:15.) Included in Aiu's definition of "unconventional" interrogation techniques were torture, physical force, sleep deprivation, food deprivation, and electric shock treatment. This connection was not the product of sheer speculation by Aiu. He had taken courses that had examined, *inter alia*, the operation of the Chinese criminal justice system. Each of those courses had featured a discussion of the use of torture in China, and Aiu had this information in mind when he reviewed the interrogation minutes.

This was not, however, the only reason Aiu surmised for the change in Wang's testimony. Aiu also thought it possible that Wang changed his story out of a desire to cooperate with the PRC police, thereby gaining for himself a measure of leniency in his eventual punishment.

Aiu did not keep to himself his suspicions regarding the possible use of unconventional techniques on Wang; he mentioned them to a number of his colleagues. Aiu shared his suspicion with fellow agents Jeannie Choy and Paul Rozario, his supervisor, Osleber, and Arnold Gin, a California law enforcement agent who had been deputized to work on the DEA task force. With respect to all four of these individuals, Aiu mentioned the possibility that the PRC police had used unconventional interrogation techniques on Wang; all of these individuals acknowledged that was a possibility (or at least did nothing to dissuade Aiu of his concern), and none of them suggested to Aiu that his concern was one worth pursuing.

Aiu also shared his concerns about the possible use of unconventional interrogation techniques on Wang with Swenson, the head of the prosecution team. Aiu told Swenson that he understood the Chinese used unconventional techniques when interrogating their suspects, and suggested that such techniques may have been used during the Wang interrogations. Swenson acknowledged that was a possibility, but the matter went no further. Had Aiu received physical evidence that PRC officials had mistreated Wang or coerced his confession, Aiu would have alerted both the PRC officials and his DEA supervisors of the mistreatment; Aiu believed that DEA policy would require him to take such action. (*See* Ex. 318 ¶ H.2.)

At the outset of the investigation, in April 1988, Swenson also had in the back of his mind the possibility that Wang might have been mistreated. The basis for Swenson's concern was not (as it had been, in part, for Aiu) the discrepancy between the March 14 and the March 19 interrogation minutes; rather, Swenson had considered the possibility Wang had been mistreated because he was a defendant in a capital crime case in another country. Whatever the basis for, or the magnitude of, Swenson's concern, however, he never raised the issue with his superiors in the United States Attorney's Office or in

the Department of Justice.[4] Indeed, as recently as May 1992, Swenson affirmatively represented to this Court that he had no basis for thinking Wang had been mistreated:

2. During the course of my involvement in the investigation and prosecution of [the Goldfish] case, including my visual observations of witness Wang Zong–Xiao in May 1988, September 1989, and March 1989, *I had at no time any information or any suggestion—nor did any of the agents in this case—that Wang Zong–Xiao had been mistreated at any time after his arrest in Shanghai in March of 1988.* Furthermore, *neither myself nor any agents had any knowledge or suggestion that any of Wang Zong–Xiao's statements made to law enforcement officials in the [PRC] in March 1988 were, in any way, coerced or brought about through any beatings or torture.* On the contrary, all of my observations and discussions with Wang Zong–Xiao, as well as with PRC law enforcement officials, indicated that Wang at no time had been mistreated, that Wang was not mistreated in the prison in which he was held, and that Wang was completely truthful with law enforcement officials from both the United States and the PRC.

3. ... By this declaration, *I am hereby stating that I have never, at any time, had any discussions with any United States government employees about any knowledge or suspicion of any mistreatment or torture of Wang Zong–Xiao.*

(Ex. 301 ¶¶ 2–3 (emphasis added).) These statements contradict Aiu's testimony that he expressed to Swenson his concern that Wang's statements might have resulted from the use of "unconventional" interrogation techniques. Swenson denied ever hearing Aiu express such a concern. (Tr., Apr. 13, 1993, at 289:10–21.) The Court, having had the opportunity to view the demeanor of both Swenson and Aiu, determines that Swenson's testimony on this point simply is not credible.[5] Aiu did inform Swenson of his concern about the use of "unconventional" interrogation techniques.

As noted above, Aiu developed his concerns about the PRC's treatment of Wang in late April and early May 1988, prior to his and Swenson's visit to Shanghai. *See* Section C, *infra.* Earlier, in April 1988, Aiu and Swenson had discussed the possibility of bringing Wang to the United States to testify at the drug conspiracy trial. Aiu and Swenson discussed the possibility of videotaping Wang's testimony in Shanghai, and then presenting that videotaped testimony to a jury; but they opted to attempt to bring Wang to the United States, thinking Wang would make a more effective prosecution witness if a jury could see him testify in person.

On April 19, 1988, Aiu drafted an "update" cable to advise DEA headquarters in Washington, D.C. of the status of the Goldfish case.[6] (Ex. 39.) With respect to Leung (who was referred to in the cable by yet another name, Leung Pak Leung), Aiu wrote that Hong Kong would prosecute him "for suspected passport violations," but not for "narcotic violations." (*Id.* ¶ 9.) Aiu went on to state, however, that the Hong Kong Police "strongly" believed "that Leung Pak Leung was the individual who coordinated the ... movement of the sea heroin and goldfish from Canton to Shanghai to San Francisco. Further, the [Hong Kong Police have] advised that the PRC authorities have obtained

---

4. At trial, counsel for both sides engaged in a heated exchange regarding the applicability of the attorney-client privilege to Swenson's communications with his supervisors in the United States Attorney's Office. (*See* Tr., Apr. 13, 1993, at 294:6–299:1; Tr., Apr. 14, 1993, at 418:10–422:8.) During his deposition, however, Swenson testified as follows:

Q. And you did not stop to talk to anybody, to discuss with anybody, "Geez, do you think there might be some potential problems or difficulties down the road if I bring over a prisoner witness from China to use in an American prosecution?"

A. *I didn't ever discuss it with anybody, no.* (Swenson Depo. at 673:5–10 (emphasis added).)

5. The Court instructed Swenson, at several points during his trial testimony, to refrain from giving evasive answers. (Tr., Apr. 13, 1993, at 293:4–12, 295:2–7, 370:12–17, 406:3–18; Tr., Apr. 14, 1993, at 463:1–3, 532:9–15.)

6. Aiu drafted the cable for the signature of Thomas Sheehan, the DEA Special Agent in charge of the San Francisco Field Office.

statements from their six (6) defendants which implicate Leung Pak Leung." (*Id.*)

Aiu also wrote that, "[b]ased upon the totality of this most current information, the [San Francisco DEA Office] is anxious to add Chico Wong and possibly Leung Pak Leung to its list of defendants in the upcoming San Francisco prosecution." (*Id.* ¶ 10.) Aiu also noted that the DEA Office was coordinating its work on the case with the United States Attorney's Office. (*Id.*) Finally, the update cable took note of the importance to the United States prosecution team's efforts of the PRC defendants, including Wang:

> 11. The [San Francisco Field Office] understands that United States prosecution on Leung Pak Leung may be substantially difficult due to the fact that evidence against him can only come from the PRC defendants. The [Hong Kong Police have] repeatedly requested that Leung Pak Leung be prosecuted in the U.S. for his narcotics involvement. *The U.S. Attorney's Office* however *has advised that this will* only be possible if access to the PRC's defendants is allowed initially for interviews and later as witnesses.

(*Id.* (emphasis added).)

Just over a week after he drafted this update cable, Aiu received an April 26, 1988, cable, drafted by Aloisi, from the American Embassy in Beijing. (Ex. 41.) The April 26 cable summarizes a conversation between Aloisi and Liu Zhi Min (or "Liu"), the Deputy Chief of the Criminal Investigation Department ("CID"), a branch of the MPS:

> 3. Narcotics Coordinator also briefed Liu on progress to date in the [Goldfish] case.... Liu was pleased that U.S. authorities were actively pursuing leads, and were still interested in attempting to prosecute Leung Pak Leung and Chico Wong. Liu said he and other MPS officials were frustrated that, even though the Chinese believed they had given Hong Kong Police evidence of Leung[']s guilt, he was still free in Hong Kong on bond. He said that the Chinese planned to "maintain pressure" on Hong Kong authorities to prosecute Leung. He characterized Leung as the "mastermind" of the entire operation.

> 4. Narcotics Coordinator, acting on suggestion of DEA Hong Kong ..., mentioned that an Assistant United States Attorney may request permission to visit Shanghai, explaining that such a trip would be a necessary step in continuing our investigation into the possibility of prosecution of Leung Pak Leung. Liu reacted positively to this idea, but urged that U.S. authorities officially request PRC approval for such a visit as soon as possible. He explained that, *under Chinese law, defendants in China—once handed over to the courts—were beyond the jurisdiction of public security units. Liu said that, as things stand now, Wang ZongXiao and the other six defendants are scheduled to be transferred to the court system sometime in mid-May. He implied that their transfer could be postponed if the MPS is requested to facilitate contact between U.S. authorities and the defendants.*

(*Id.* (emphasis added).) Hence, the April 26, 1988, cable from Beijing placed the American prosecution team on notice that, in the absence of intervening requests by the United States, the MPS, in less than a month, would turn Wang over to the PRC court system, thereby jeopardizing the prosecution team's plan to use Wang as a witness in the United States.

In early April 1988, Harris learned from Boucher that the Hong Kong police had obtained a videotape of one of Wang's interrogation sessions. Harris viewed approximately five minutes of the videotape in the Hong Kong police headquarters. Although he could have viewed the rest of it, he chose not to; he also never asked Boucher for a copy of the videotape. While he was watching the videotape, Harris noticed that Wang was at the extreme left of the screen, and that an officer, whose face was not visible on the videotape, had both hands on the left side of Wang's body.

In an April 23, 1988, cable, the Embassy in Beijing confirmed a DEA request for translated copies of witness statements for purposes of building a case against Leung. (Ex. R ¶ 1.)

### C. The Prosecution Team's May 1988 Trip.

On April 28, 1988, Aiu authored a cable to DEA headquarters, seeking permission for himself and Swenson to travel to the PRC for the purpose of, *inter alia*, interviewing the PRC defendants in Shanghai. (Ex. 42 ¶ 3.)

During his trip to the PRC in May 1988, Aiu kept a journal of his activities. (Ex. 183.) He left San Francisco on May 7, traveling alone. He arrived in Hong Kong on May 10; Swenson already had arrived in Hong Kong. On May 11, Aiu, Swenson, and Harris spent several hours reviewing various aspects of the case and evidence obtained from the Hong Kong Police; at no time during this meeting did Swenson or Harris discuss Boucher or the reasons Hong Kong declined to prosecute Leung.

On May 12, Aiu and Swenson met at Boucher's office; there, Aiu conducted a half-hour interview of Chico Wong. On the following day, May 13, Aiu prepared a DEA report, called a "DEA–6," of his interview with Chico Wong.

While in Hong Kong, Swenson met with Boucher for about an hour. During this meeting, Boucher told Swenson he had a videotape related to the investigation, and that Wang appeared on that videotape. (Swenson Depo. at 931:20–23.) Swenson did not ask to see the videotape, nor did he ask Boucher for a copy of it. Although Swenson was a guest for five days at the home of a Hong Kong prosecutor, John Cunningham, Swenson never asked Cunningham (who did not have responsibility for the Goldfish case) or any other individual from the Crown Counsel's Office about the reasons Hong Kong decided not to prosecute the case.

On May 16, Aiu, Harris, and Swenson flew from Hong Kong to Beijing. Prior to their scheduled meeting with officials from the MPS, the prosecution team met with James Keith, another Narcotics Coordinator from the Embassy in Beijing.[7] At no time during this meeting in the American Embassy did Aiu or Swenson mention Aiu's concern, which he had expressed to Swenson prior to the

China trip, that the change in Wang's testimony might have resulted from unconventional interrogation techniques; neither Aiu nor Swenson mentioned that concern to Harris.

On May 17, the following American officials met with representatives from the MPS: Aiu, Aloisi, Harris, Keith, Swenson, and James Brown, the interpreter for the American Embassy in Beijing. Among the MPS officials present were Zhou Nianshan, the Deputy Director of the CID, Liu Wen, the General Director of the CID, and Liu Zhi Min. The American representatives knew, going into the meeting, that it would be unprecedented for the Chinese government to allow its own criminal defendants to travel to the United States to testify in an American criminal trial. Nevertheless, Aiu and Swenson both raised the prospect of bringing Wang to the United States to testify. The MPS officials indicated they would consider honoring the request. After the meeting with the MPS representatives, the members of the American delegation expressed to one another their pleasure that the Chinese did not reject the idea outright.

Later that evening, May 17, Aiu, Swenson, and Harris attended a banquet; Liu Wen and Liu Zhi Min also attended that banquet. Before eating, the five men had a half-hour discussion, during which the American officials, including Swenson and Aiu, again discussed the possibility of interviewing Wang in Shanghai and thereafter bringing him to the United States to testify. Once again, the Americans were heartened by the Chinese response: Liu Wen said the PRC would consider the request.

Aiu, Harris, and Swenson arrived in Shanghai on May 19. They were accompanied by Wang Qianrong, an official from the MPS, who served as interpreter during the Shanghai leg of the prosecution team's journey. Once they arrived in Shanghai, the members of the prosecution team were joined by Yuan You Gen ("Yuan"), Vice Chief of the Shanghai PSB, and Darrell Jenks, who worked as a political officer in the United States Consulate General in Shanghai.

---

7. Aloisi and Keith prepared an itinerary for the visit to Beijing. (Ex. 50.) Aloisi coordinated the prosecution team's interviews with MPS officials and the defendant witnesses. (*See* Exs. 46, 49.)

On that same day, May 19, the members of the American prosecution team, joined by Yuan and Wang Qianrong, interviewed Wang for approximately an hour-and-a-half. Several hours before that meeting with the American prosecution team, Huang met with Wang. At that time, Huang told Wang to review the statement he had given to the PRC police on April 21, and to stick closely to that statement during his interview with the Americans.

During this interview, portions of which the PRC officials videotaped, Swenson, Aiu, and Harris were seated behind a table on a dais; Wang sat in a chair placed in the middle of the room, and MPS and PSB officials flanked him on either side of the room. Aiu led the questioning for the American delegation, although Swenson and Harris asked a few questions; Aiu also took handwritten notes of the interview. Wang understood only Shanghaiese and was not able to speak English. Wang Qianrong, a PRC police official, was the sole interpreter for the interview session; no member of the American team could verify that Wang Qianrong was translating the questions and answers accurately.

Aiu had thought the interview would be conducted in a one-on-one type setting, of the type to which Aiu, a DEA agent, was accustomed, rather than having Wang sit in the middle of the room. To Aiu, Wang appeared to be in good health and alert to what was going on during the interview; Aiu observed no visible signs of mistreatment.

Although his main concern during the interview was to elicit information about Chico Wong, Aiu did plan to question Wang about whether Leung was present when the heroin was delivered to Shanghai. According to the

DEA–6 that Aiu prepared the following day,[8] May 20, Wang did *not* place Leung at the scene of the delivery:

> 5. WANG was then questioned as to the description of the two (2) men who delivered the seven (7) blocks of heroin (approximately 4.5 kilograms) to him. *Wang stated that he could not provide a very good description, only that he'd never seen them before.* WANG was able to describe the heroin as initially within two big plastic bags. The heroin came in a brown suitcase and the substance itself was yellow in color. WANG told [Special Agent] Aiu that Leung paid $50,000.00 HK for the heroin and he believes it came from Hong Kong. WANG could not provide information on how the heroin was smuggled into Canton where it was turned over to him.

(Ex. 51 (emphasis added).) Aiu was surprised by Wang's omission of Leung's presence at the delivery of the heroin, but he did nothing during the May 19 interview to follow up on that omission; indeed, *no* member of the prosecution team followed up with Wang regarding the change in this detail.

At the conclusion of the interview, Aiu asked Wang whether he would be willing to travel to the United States to testify against Leung and Chico Wang. Aiu heard (1) Wang Qianrong speak to Wang in Chinese (Wang Qianrong was speaking Mandarin, not Shanghaiese, although neither Aiu nor any other member of the prosecution team could tell the difference), and (2) Wang say something back to Wang Qianrong, also in Chinese; Wang Qianrong then told Aiu that Wang had answered the question affirmatively. Wang testified that he has no recollection of Wang Qianrong translating this question.

---

**8.** This DEA–6 is the only existing record memorializing Aiu's account of the May 19, 1988, interview of Wang. As noted in the text, Aiu took notes during the interview. Upon his return to San Francisco, however, Aiu destroyed those notes; Aiu testified that destroying his notes was a clear violation of DEA policy. (*See also* Ex. 322, § 6211.6.)

Harris did not take notes during this interview, nor did he prepare a DEA–6 summarizing what had occurred. Rather, Harris reviewed Aiu's DEA–6; Harris made no corrections to Aiu's report.

Swenson knew that Aiu was taking notes during the May 19, 1988, interview. Swenson neither asked Aiu for a copy of those notes nor requested that Aiu preserve them. On August 31, 1989, however, Swenson, responding to the Goldfish defendants' motion to compel government agents to retain their rough notes, made the following representation to this Court: "With regard to the question of preservation of rough notes by agents of the United States, in this case [DEA] agents, *such notes are, as a matter of course, preserved, and will be in this case also.*" (Ex. 306 at 2:1–4 (emphasis added).)

Aiu did write in the DEA–6 that the MPS had provided "Reports of Investigation" regarding the case. (*Id.* ¶ 11.) At the time of that writing, Aiu had made a request to Yuan for such reports; Aiu also had requested that the DEA office in Hong Kong make such a request. (Ex. P.) To Aiu's knowledge, however, these reports were not provided to the American prosecution team or to the DEA at any time before the trial commenced in January 1990. When the trial did commence, Aiu (who left the DEA to work for the United States Customs Service in November 1988) asked Swenson whether the MPS had provided the reports referenced in the DEA–6; when Swenson told Aiu that the MPS had not provided the reports, Aiu recognized this was a matter of concern for the prosecution.

Aiu did not include in the DEA–6 either a reference to the Hong Kong Crown Counsel's decision not to prosecute Leung or an explanation for that decision. At trial, Aiu testified that Inspector Boucher had given him three reasons for Hong Kong's decision not to prosecute Leung or Chico Wong: (1) because the Hong Kong prosecutors had minimal evidence against the two defendants, (2) because the Royal Hong Kong Police were reluctant to provide either defendant to the PRC when the expected reciprocity from the PRC was minimal, and (3) because Hong Kong did not want to provide Leung to the PRC for prosecution out of fear he would be executed if found guilty.[9] Harris also claims to have had a conversation with Boucher regarding Hong Kong's decision not to prosecute Leung or Chico Wong. According to Harris, Boucher told him that Hong Kong had insufficient evidence to launch such a prosecution.

During the May 1988 trip, neither Aiu nor Swenson questioned Wang about the possible use of unconventional interrogation techniques upon him. Nor did they ask any PRC officials about such techniques. Aiu testified that he made a conscious decision not to ask any such questions because of the unprecedented access to Wang the PRC had granted the American team, and because of the lack of actual evidence that Wang had been mistreated.

At the conclusion of the May 19, 1988, interview, Aiu and Swenson told Yuan they wished to have Wang testify in the United States. Yuan indicated that officials in Beijing would make the final decision on that request. Later that evening, Aiu, Swenson, and Harris attended a banquet with Yuan and other Chinese officials. During that banquet, the American team again renewed their request to bring Wang to the United States; Aiu told the PRC representatives there was "no downside" to the request, and that Wang's testifying in an American courtroom would be a "win win situation." (Tr., Apr. 8, 1993, at 148:4–9.)

The prosecution team left the PRC on May 23, 1988. Upon his return to San Francisco, Aiu drafted a cable to DEA headquarters, summarizing the prosecution team's trip to China. (Ex. 53.) Aiu relayed news about the prosecution team's request to use Wang as a witness at the trial in the United States, and about Liu Wen's favorable response to that request. (*Id.* ¶¶ 3–4.) Aiu also discussed the prosecution team's favorable impressions of Wang as a witness. (*Id.* ¶ 6.)

In July 1988, Aiu received a cable from Harris, expressing the latter's position "that DEA and the Hong Kong counterparts have done their part to bring these mutual targets, the organizers, to justice. To best insure the odds of successful prosecution MPS must be encouraged to cooperate fully." (Ex. 57 ¶ 6.) Further, Harris, on behalf of himself, Swenson, and the San Francisco DEA Field Office, urged that the Chinese be encouraged to send their witness defendants, including Wang, to San Francisco for purposes of giving testimony in a criminal trial. (*Id.*)

### D. *Wang's September 1988 Trip to San Francisco.*

On July 22, 1988, the United States Attorney's Office filed a superseding indictment against, *inter alios,* Leung, Chico Wong, and Andrew Kit Wong. The members of the prosecution team knew that Leung was in

---

9. Wang moved to strike this portion of Aiu's testimony. The Court overruled that motion for reasons stated on the record. (*See* Tr., Apr. 13, 1993, at 244:4–248:9.)

Hong Kong and that the United States would need to make a formal extradition request to have him brought to the United States.

To that end, the prosecution team made arrangements to bring Wang to the United States for purposes of having him execute an affidavit. On August 2, 1988, Swenson sent to P.J. Cahill, the Senior Assistant Crown Prosecutor, a draft affidavit for Wang's signature. Swenson wrote that "[a]ll of the information in the affidavit is based on questioning of Wang by P.R.C. officials, as well as of his interview by myself and DEA Agent Tommy Aiu during our trip to the P.R.C. in May." (Ex. 59 at 1.) With respect to the "questioning of Wang by P.R.C. officials," Swenson drafted the affidavit based on the March 19 statement; specifically, the draft affidavit Swenson sent to Cahill placed Leung at the scene of the heroin delivery and at the breaking up of the heroin.

Swenson included the version of events that was more inculpatory of Leung (who was, on August 2, 1988, in Hong Kong), despite Aiu's expression of concern, and without ever having asked the PRC officials whether Wang had been mistreated. Swenson did not question the PRC officials prior to August 2, 1988, because he thought it would be "very insulting" to do so, because he believed he had "no evidence" of mistreatment, and, in part, because asking the question would have doomed the PRC–American cooperative effort.[10] (Tr., Apr. 13, 1993, at 363:4–5.)

During August 1988, Cahill met with Harris. During that meeting, Cahill mentioned the videotape of Wang's interrogation that Harris had viewed in April 1988. *See* Section B, *supra*. Cahill confirmed that this videotape recorded one of the interrogations that had been translated into an interrogation statement.

Also in August 1988, the American Embassy in Beijing began to finalize arrangements for bringing Wang to the United States to testify at the criminal trial. On August 18, 1988, Keith sent a cable to, *inter alia*, the Department of State and the DEA Field

Office in San Francisco, containing the following information and request:

> 3. On August 11, 1988, the [MPS] stated that they accept our request "in principle" regarding the travel of PRC "defendant witnesses" Wang Zongxiao and Leung Chun–Wah and escorts to San Francisco to participate in the "Goldfish" trial. *The MPS would like to make clear: 1) the US government should* present a note to the Chinese government via diplomatic channels, and *ensure reciprocity under "the same circumstances in the future"*; 2) *the US side should* ensure the safety of the PRC defendant witnesses and escorts and *return the witnesses by the date decided by both sides*
>
> . . . .
>
> . . . .
>
> 6. *Guidance requested: Regarding MPS first point, is Embassy correct in assuming that Department would draft the diplomatic note? Would also appreciate Department[']s reaction to the Chinese request for a "reciprocity clause" in the diplomatic note.*

(Ex. 60 (emphasis added).) On September 2, 1988, the Department of State furnished the requested "guidance" in a cable that included the following language:

> 2. Regarding the points raised by the Chinese ... [the] Department provides background below to assist Embassy in addressing the Chinese request:
>
> —A. L[egal] and Justice Department have problems concerning the Chinese request for reciprocity under "the same circumstances in the future". *It would be difficult, if not impossible, for the [United States government] to agree to reciprocal circumstances in the event of U.S. witnesses being requested to travel for testimony in a trial in China.* Federal vs state jurisdictions could undoubtedly be involved *as could rights of witnesses.*

(Ex. 61 (emphasis added).) The diplomatic note, which the American Embassy sent to the Chinese government on September 8,

---

10. Swenson, in a burst of candor that was uncharacteristic of his three days on the witness stand, stated that "Mr. Wang wouldn't be here today if I asked questions like that." (Tr., Apr. 13, 1993, at 361:20–21.)

1988, included the following response to the PRC's request for "reciprocity":

> Reciprocity: Unfortunately, the Government of the United States cannot guarantee reciprocity for witnesses "under the same circumstances in the future". In the event that a witness from the United States were requested to travel to the [PRC] for testimony, *and if the witness consented to travel to China to testify,* then the United States Government could comply with the request. *If the witness refused to testify, however, the Government of the United States would not be able to force him or her to do so.* Moreover, the Government of the United States might be required to request the assistance of a State Government to release a witness held in State custody.

(Ex. 66 at 1 (emphasis added).)

Regarding the issue whether the Chinese witnesses, including Wang, might apply for asylum once they arrived in the United States, the September 2 cable included the following paragraph:

> 5. FYI: *One additional concern is that the Chinese witnesses might seek asylum upon arrival or while in the U.S. It is very unlikely that an asylum request would succeed, but it could conceivably delay the witnesses['] return to China. Embassy may at its discretion wish to mention this concern to PRC officials. If you do so please advise.*

(Ex. 61 (emphasis added).) Keith and his supervisor, Raymond Burkhart, the Embassy Political Consul, discussed the possibility of raising the asylum issue with the Chinese government and made the discretionary decision to not raise it. One of the reasons for Keith and Burkhart's decision was their belief that, if the PRC thought its witnesses might apply for asylum, it might be less willing to risk sending them to the United States. In a September 8, 1988, cable, the Beijing Embassy advised the DEA (including the DEA office in San Francisco) as follows:

> Chinese willingness to allow the witnesses to testify in the U.S. is a promising development which could serve to put the difficulties in bilateral narcotics cooperation of this past summer completely behind us.

We believe that if the testimony of the witnesses is crucial to cases against "Goldfish" defendants, we should not bargain over the cost of paying for the escorts. *The Chinese are not as anxious to make this cooperative venture work as we are.*

> 4. *If we express our concern that the witnesses['] return to China could be delayed by asylum requests, we believe that the Chinese might decide against sending them. We therefore do not intend to raise this issue with the [MPS] at present.*

(Ex. 64 ¶¶ 3–4 (emphasis added).)

On September 7, 1988, Aiu drafted a cable to DEA headquarters regarding the need to bring Wang to San Francisco to execute an affidavit in support of the extradition request:

> The [San Francisco DEA Field Office] does agree that it would be most advantageous to have the primary PRC defendant Wang Zong Xiao along with a PRC official fly to San Francisco for the signing of the affidavits before the US Magistrate. Such a trip would tactically serve two purposes of [*sic*] 1) solve the problem of having Wang Zong Xiao's affidavit signed before a US Magistrate instead of a consular official which would have legal implications in Hong Kong, and 2) set the precedent of having a PRC defendant and official travel to a foreign jurisdiction for testimonial purposes. *Once in the United States, the PRC defendant would be available for detailed debriefing by* [Special Agent] *Thomas K. Aiu and pre trial preparation by* [Assistant United States Attorney] *Eric Swenson.*

(Ex. 63 ¶ 1 (emphasis added).)

On September 8, 1988, Harris drafted a cable to DEA headquarters, summarizing a discussion between himself and Cahill regarding the draft extradition affidavit. (Ex. 65.) Harris relayed Cahill's preference for having the affidavit executed in the United States:

> 8. For [San Francisco DEA, American Embassy, Beijing, and Consulate General, Shanghai:] ... Harris has conferred with Hong Kong Crown Counsel Peter Cahill. Based on these discussions, a revised draft

affidavit for Wang Zong Xiao (and Chinese translation) is being returned to AUSA Swenson by fax. It is believed that this draft includes all the elements required by the extradition treaty between the U.S. and the United Kingdom. A copy of the draft is also being forwarded to [the American Embassy in Beijing and the Consulate General in Shanghai] ... for information purposes *or should it become necessary that affirmation be taken in the PRC, though much less desirable from a Hong Kong and U.S. legal position with reference to the requirements of the extradition treaty and probable defense tactics by defendant Leung.*

(*Id.* (emphasis added).)

On September 8, 1988, the American Consulate in Hong Kong requested that the Justice Department make arrangements with the INS to have Wang paroled into the United States. (Ex. U ¶¶ 6, 9.) On September 13, 1988, the Central Office for Refugees, Asylum, and Parole ("CORAP"), the INS division responsible for processing, *inter alia*, requests for immigration parole, received from the DEA a parole request for Wang. (Ex. W.) The CORAP parole officer thereafter created a parole card for Wang and logged the DEA request. (Exs. X, Y.)

On September 15, 1988, the American Consulate in Shanghai followed up with another request that immigration parole be granted for Wang. (Ex. AA ¶ 1.) The following day, September 16, the Hong Kong Consulate advised the Beijing Embassy and the Shanghai Consulate that the INS had granted the request for parole. (Ex. AB ¶ 2.) On that same day, the Shanghai Consulate drafted the transportation letter for Wang.[11] (Ex. AC.) An INS "I–94" form, which is a record for arrival and departure, issued on September 19, 1988. (Ex. AD.)

Wang was told he would be going to San Francisco the night before his departure. Huang told Wang to review again the April 21 interrogation statement; he also reminded Wang of the dire consequences he would face in the event he deviated from what was in the April 21 statement.

Wang arrived in San Francisco on September 19, 1988, accompanied by two PRC officers, including Officer Huang; this was the same Officer Huang who interrogated Wang upon his arrest in Shanghai and who instructed Wang prior to his May 19, 1988, interview with the American prosecution team and his September 1988 trip. Aiu was on hand to receive Wang and the two PRC police officials at San Francisco International Airport. One of the PRC police officials presented a parole authorization letter to the immigration inspector at the airport. (Ex. AC.)

During the time Wang was in the United States in September 1988, Aiu and Swenson had unlimited access to see him. Swenson met with Wang on September 19 and 20; Tom Lam, a certified Chinese interpreter who works in the San Francisco area, interpreted the conversations on these two days. At the September 19 meeting, Swenson reviewed with Wang the affidavit that Swenson would present to United States Magistrate Judge F. Steele Langford. Swenson and DEA Agent Choy took handwritten notes during the September 19 meeting. (Ex. 192 at 1–2.)

Swenson originally drafted the affidavit in English, and then had it translated into Chinese. (Exs. H, I.) At no time during the September 19 meeting did Swenson ask Wang whether there were other interrogation minutes that he, Swenson, should have examined before preparing the affidavit; Swenson also did not ask Wang whether he had given the PRC police officials any other statements that were not reflected in the affidavit. Swenson made several changes to the affidavit based on his conversation with Wang. (*See* Tr., Apr. 14, 1993, at 591:24–593:12.)

On September 20, Wang appeared before Magistrate Judge Langford. Wang swore,

---

**11.** A transportation or "boarding" letter takes the place of a visa, and informs the carrier (i.e., the airline) that the United States government has approved the alien's travel to the United States; the letter provides the same information to the immigration inspector at the port of entry. In a foreign country where the INS has no office, the boarding letter takes the place of INS form "I–512." At all times relevant to this litigation, the INS had no office in the PRC.

under oath, that the affidavit was true and correct. Magistrate Judge Langford certified that he had witnessed Wang sign and swear to both the English and the Chinese affidavits. (Ex. H at 10; Ex. I at 9.)

The affidavit that Wang executed on September 20 included the version of his story that placed Leung at the scene of the heroin delivery and at the scene of the breaking up of the heroin. (Ex. 252 ¶¶ 10–11.)

After the appearance before Magistrate Judge Langford, Swenson, Wang, the two PRC police officers (including Huang), and Lam returned to Swenson's office. The two PRC officers thereafter excused themselves for several minutes, leaving Swenson alone with Wang and with Lam; this was the only time during Wang's September 1988 visit to the United States that he and Swenson were alone together, outside the presence of PRC officers. Swenson did not takes notes during this meeting. Wang got Swenson's attention and, with Lam translating, asked Swenson whether he could do anything to help Wang and prevent him from being executed. Swenson, via Lam's translation, told Wang that he thought his cooperation would result in the Chinese according him leniency. Swenson also told Wang there was a possibility he would return to the United States to give testimony at a trial; Wang did not respond in any way. Soon after this brief interchange, the PRC officers returned to Swenson's office.

Swenson had asked the question whether Wang would be willing to come to the United States at a time when the PRC police officials *were* in the room. The officers communicated in Chinese to Wang, and reported back to Swenson that Wang had provided an affirmative answer.

At no time during Wang's September 1988 visit to San Francisco did Swenson or any other official from the United States raise the issues of mistreatment or coercion with either the PRC officers or Wang. Swenson testified that he asked no such questions because he "had no evidence that [Wang] had been mistreated in any way" and, because given his relationship with the PRC representatives and the cooperation between the American and Chinese governments, "it would have been almost insulting to raise" such issues with the PRC officers. (Tr., Apr. 15, 1993, at 605:18–606:3.)

On September 23, Aiu, Choy, Osleber, and Swenson attended a dinner honoring the two PRC police officials who accompanied Wang. Aiu thought the dinner significant for law enforcement purposes, because "it displayed DEA's willingness to cooperate fully with the PRC on [the Goldfish matter] and all other investigations." (Ex. 73 ¶ 1.) Accordingly, he asked DEA headquarters to reimburse the San Francisco Field Office for the cost of the dinner.

### E. The Prosecution Team's March 1989 Trip.

On February 17, 1989, Swenson asked Harris to make arrangements for Swenson's second Goldfish-related trip to the PRC. (Ex. 81.) In his letter, Swenson asked Harris for assistance in gaining from the PRC officials certain information about the cooperating witnesses, including Wang:

[W]e need to know the status of the criminal prosecution of the two witnesses, as well as some indication as to what promises have been given to them by the Chinese authorities in return for their cooperation. *This may be a sensitive area but we need to impress upon the Chinese that, under American law, this is the type of information that the prosecution is required to provide to defendants' lawyers. Also, the defense lawyers have indicated that they will be asking the court to order the United States to provide copies of any other written, or tape-recorded (including videotapes), interrogation or interviews of the defendant witnesses. At this time, they have the three prior statements of Wang and the two statements of Leung, which we obtained directly from the Ministry of Public Security.* I have indicated that I do not know whether there are any other written or recorded statements. *Perhaps this is an issue that you could explore with the Shanghai MPS before our visit.*

(Ex. 81 at 2–3 (emphasis added).) Swenson wrote this letter in connection with his oppo-

sition to the Goldfish defendants' motion to compel certain Jencks Act material.

Shortly before he left for the March 1989 trip, Swenson telephoned Harris and asked him whether there were any other interrogation minutes. Swenson recalls Harris' response as, "we got it all." (Tr., Apr. 13, 1993, at 271:6.) Swenson made this inquiry to follow up on his February 17 letter to Harris. (Ex. 81.) Harris, however, who in April 1988 had viewed five minutes of a videotape of Wang's interrogation, *see* Section B, *supra*, and to whom Cahill in August 1988 had mentioned the videotape, *see* Section D, *supra*, made no further request of any PRC official for *any* additional statements, videotapes, or audio tapes. Nor did any other American official or prosecution team member make any such request.

During a telephone conversation with Swenson in February 1989, Harris made a "to do" list of items on which he and Swenson needed to follow up. (Ct.Ex. II at 24.) Several of the items on this list have "check" marks placed next to them. Only two items have no such marks: "VIDEO—Check" and "are there other tape statements." (*Id.*) Neither Harris nor Swenson took any action with regard to these two items prior to the start of the Goldfish trial.

In a memorandum filed with this Court on March 3, 1989, Swenson placed his signature under the following representation:

> The United States will make a good faith effort to inquire of the [PRC], through the United States Embassy in Beijing, as to whether or not there exists any other Jencks Act material of the two witnesses in question [including Wang], *including any video- or audio-recordings of their actual oral statements in Chinese. To the extent that such information exists, and the United States is able to obtain it, we will, of course, make it available to defendants' counsel.*

(Ex. 257 at 5:3–10 (emphasis added).) When Swenson made this representation to this Court, he already had received word from Harris that there were no additional statements of Wang. At no time during his conversation with Swenson did Harris represent that his information ("we got it all") was

based on conversations with PRC officials. On his subsequent trip to the PRC, Swenson made *no* additional inquiries regarding the existence of either written records, videotapes, or audio recordings of PRC police interviews with Wang; indeed, Swenson made no further inquiries whatsoever regarding any such material until January 1990. Swenson did not make any new requests, because he believed that Harris had exhausted all avenues for obtaining such information when he reported to Swenson, "we got it all."

On March 1, 1989, DEA headquarters sent a cable to, *inter alia*, Keith and Harris. (Ex. AE.) That cable included the following paragraph:

> With regard to the two defendant witnesses, what is the current status of the criminal prosecution as well as what promises were given to the defendant/witnesses in return for their cooperation. (*This matter must be impressed upon the Chinese government—that this information must be furnished to defense as part of discovery.*) Defense will be asking the United States to provide copies of any written or tape recording (including videotapes), interrogation or interviews of the defendant witnesses. At this time, the [San Francisco Field Office] has in its possession, three prior statements from Wang and the two statements of Leung, which were obtained from the [MPS].

(*Id.* ¶ 5 (emphasis added).) After he received this cable, Keith made no additional requests of the PRC police officials for witness statements or videotapes of witness interviews.

Swenson went first to Shanghai, arriving there on March 6. The following day, March 7, Swenson and Harris met with a number of PRC officials, including Yuan, Zhu, Huang, Liu Zhi Min, and Wang Qianrong, and a PSB officer named Kang; Swenson and Harris also met with these same officials on March 8. During the March 8 meeting, Swenson explained to the four Shanghai police officers (Yuan, Zhu, Huang, and Kang) the documents they would be sponsoring at trial; he also discussed some basic American concepts

of evidence and cross-examination.[12] Swenson told the PRC officials that defense counsel would attempt to discredit Wang on cross-examination. With respect to what the substance of that attempt might be, however, Swenson only discussed the probability that defense counsel would ask Wang about the fact that he faced a death sentence in the PRC for his role in the drug offense. Swenson did not alert the Chinese to the prospect that defense counsel would explore on cross-examination whether Wang was mistreated or whether his confession was coerced.

Later that day, March 8, Swenson met with Wang for about two hours; Yuan, Zhu, and Huang also were present, as was Wang Qianrong, who again served as interpreter. During that meeting, Swenson reviewed the substance of Wang's testimony, and also explained to Wang the concept of cross-examination. Swenson told Wang that the defense counsel would attempt to highlight inconsistencies between his trial testimony and any earlier statements he might have given. Once again, however, Swenson did not discuss the possibility that defense counsel would ask Wang whether he had been mistreated by the PRC police; nor did Swenson ask Wang whether he had been mistreated at any time since his arrest almost a year earlier. Swenson mentioned that Wang might be coming to the United States to testify in person; when Wang Qianrong translated that remark, Zhu became visibly upset and told Yuan that Swenson was not supposed to discuss that prospect with Wang.

From Shanghai, Swenson traveled to Hong Kong, arriving there on March 9. The following day, March 10, he met with Inspector Boucher. At that meeting, Boucher gave

Swenson a number of memoranda. Among these memoranda were several that dealt with Hong Kong's decision not to prosecute. Boucher gave these documents to Swenson with the admonition that they were from the Attorney General's Chambers, and Boucher, consequently, should not have them; Boucher nevertheless told Swenson he thought he would "be interested in them." (Tr., Apr. 13, 1993, at 388:8–10.) The first of these memoranda is from Crown Counsel R.B. McNair to J.P. Chandler, the Deputy Crown Prosecutor, and Cahill ("McNair Memorandum"). (Ex. 34.) The McNair Memorandum appears to have been written on March 28, 1988, and contains McNair's summary of Hong Kong's case against the Goldfish defendants and his recommendation that Hong Kong not prosecute Leung for his role in the conspiracy.

It appears from McNair's summary of the facts that he had before him the March 19, 1988, interrogation minutes: [13]

4. I preface this portion of my note with the caveat that the whole of our case rests on the confessions ... of [Wang] to PRC police officers. To the extent he can be believed, our facts are provable. *The most recent, and lucid, confessions are prefaced with a statement from the interrogator which reads "as to the particular section of the "criminal law" which you are guilty of, and the criteria governing the leniency at [sic] strictness with which this case is to be handled, you conducted on you [sic [14] ]. We hope you would honestly reveal all the facts as soon as possible so as to appeal to the Government for leniency towards you*".

---

**12.** That Swenson devoted very little attention to the concept of cross-examination is apparent from Harris' recorded summary of his and Swenson's conversation with officials and witnesses in the PRC; that summary makes it clear that Swenson focused almost exclusively on the witnesses' *direct* examination. (Ex. 100 ¶ 1.)

**13.** The Court admitted these documents for the limited purpose of demonstrating Swenson's state of mind. (*See* Tr., Apr. 13, 1993, at 387:14–16.) Hence, whether McNair read the March 19 interrogation minutes *is not* relevant; what *is* relevant is what Swenson knew or should have known after reading these memoranda.

**14.** This sentence in the McNair Memorandum omits the following words, between "you" and "conducted on you," from the March 19, 1988, interrogation minutes: "should know much about them after so many interrogations have been." Swenson underscored the words "after so many interrogations have" on his copy of the March 19, 1988, interrogation minutes. Despite McNair's omission, it appears that this passage from the interrogation minutes caught the attention of both Swenson and McNair.

(*Id.* ¶ 4 (emphasis added).) The "discussion" section of the McNair Memorandum contains the following two paragraphs:

15. I understand a great deal of pressure is being exerted upon our police to prosecute Leung for the D.D. offences, using [Wang] as a witness. I'm not aware of any diplomatic level pressure at this point.

16. However, *it seems to me*, with respect, *that the likelihood of conviction is small. I am unaware of the methods or circumstances surrounding the taking of* [*Wangs*] *confessions, however, a video tape has been supplied (and viewed by) Inspector Boucher, who tells me that a most peculiar posture was adopted by* [*Wang*] *throughout the confession, whereby the whole of his left side and left arm was hidden from the camera, as if his left arm and side may have suffered some injury.*

(*Id.* ¶¶ 15–16 (emphasis added).) McNair's recommendation is contained in the following paragraph:

17. We should not prosecute Leung for D.D. related matters at this point. We have the jurisdiction *but next to no evidence.* We do not have s.33 Crimes Ordinance statements from [Wang]. The Crown should press on vigorously with the visa/forged chops case, which would allow us to help Leung within the jurisdiction, *and allow a formal suggestion to the U.S. to be made to extradite Leung for trial there.*

(*Id.* ¶ 17 (emphasis added).)

The second of the three memoranda that Boucher handed Swenson appears to be a March 31, 1988, transmittal letter from J.P. Chandler ("Chandler Memorandum"). (Ex. 35.) While it is not clear from the face of the document to whom the Chandler Memorandum is addressed, it does appear that the McNair Memorandum accompanied the Chandler Memorandum. (*Id.* ¶ 6.) The Chandler Memorandum also references a conversation between its author and an individual named Cantley. Chandler's assessment of Hong Kong's case against Leung is spelled out in the following paragraphs:

4. It is also my view shared by both [McNair] and Cantley that even if the witness was put in a position where he could give evidence in Hong [K]ong, *the fact that he is an uncorroborated accomplice* [*who*] *would be testifying as a result of the greatest possible inducement would almost inevitably lead to an acquittal. Indeed it would be unsafe to mount ·a prosecution based upon his evidence.* Do you agree?

5. Cantley believes that there is no real likelihood that the case can be strengthened. They have far greater priorities. He would like to put the matter to rest. I think we should. *If the USA authorities wish to pursue their own approach, that is a matter for them.*

(*Id.* ¶¶ 4–5 (emphasis added).)

The final memorandum that Boucher gave Swenson is a June 4, 1988, memorandum from J.K. Findlay, Director of Public Prosecutions, to J.P. Chandler ("Findlay Memorandum"). (Ex. 37.) From the face of the Findlay Memorandum, it appears that Findlay was the recipient of the Chandler Memorandum. (*See id.* ("Thank you for your note of 31 March 1988.").) The following paragraphs set forth Findlay's assessment of the case against Leung:

2. I agree that the chances of obtaining a conviction against Leung are too low to justify a prosecution; *certainly, too low to justify an entry into the political and diplomatic horror involved in getting* [*Wang*] *here using him and returning him to—what?*

3. *My thanks to* [*McNair*] *for his speedy and sensible advice.*

(*Id.* ¶¶ 2–3 (emphasis added).)

At the time Swenson received the McNair, Chandler, and Findlay memoranda, he knew, based on his experience as a prosecutor, that these documents ordinarily would not be allowed to leave a prosecutor's office. Swenson nevertheless accepted all three memoranda and read them on his return flight to the United States.

At trial, Swenson testified that when he read the McNair Memorandum, and saw in paragraph 16 thereof the reference to "a video tape ... supplied by Inspector Boucher," showing Wang "adopt[ing]" "a most pe-

culiar posture," he, Swenson, thought of the videotape the PRC police officials made of the *May 19, 1988,* interview of Wang that the American prosecution team conducted. (*See* Tr., Apr. 13, 1993, at 404:1–13.) It is not clear whether Swenson was testifying (1) that, at the time he first read paragraph 16, he thought the videotape made on May 19, 1988, was the same videotape discussed in the McNair memorandum, or (2) that he thought McNair's reference to "a most peculiar posture" and "the whole of [Wang's] left side and left arm [being] hidden from the camera" could be explained by the fact that Swenson thought the PRC police officials were sloppy and amateurish photographers. Neither possibility is worthy of credence.

The first possible explanation (that the May 19, 1988, videotape was the one discussed in paragraph 16) is implausible in light of the fact that the McNair Memorandum appeared (based on the date that is on the *same page* of the McNair Memorandum as is paragraph 16) to have been prepared on *March 28, 1988,* almost two months *before* the date the American prosecution team conducted the videotaped interview of Wang. The second possible explanation (that Swenson simply thought the PRC police officials used "primitive" videotape technology) cannot be believed, given that McNair, in paragraph 16, was adverting to the possibility that Wang had been tortured, either before or during the videotaped confession. Thus, McNair noted that he was "unaware of the methods or circumstances surrounding the taking of [Wang's] confessions," and specifically stated that Wang's "left arm and side may have suffered some injury." (Ex. 34 ¶ 16.)

Whatever Swenson thought when he read paragraph 16, several things are certain. First, he *never* asked anyone from the PRC for a copy of the videotape discussed in the McNair Memorandum until after Wang testified at the Goldfish trial. He failed to do this despite his representation to this Court that he would "make a good faith effort to inquire of the [PRC] ... as to whether or not there exists *any* other Jencks Act material" relating to Wang, "including *any* video- or audio-recordings of [his] actual oral statements in Chinese." [15] (Ex. 257 at 5:3–8 (emphasis added).) Second, Swenson *never* showed the McNair Memorandum to Aiu, to Harris, or to any other member of the prosecution team; indeed, Aiu did not know the McNair Memorandum existed until he saw it at his deposition. Third, Swenson *never* gave a copy of the McNair Memorandum to the *Leung* defense counsel, despite their repeated requests for all Jencks Act and *Brady* material. Fourth, Swenson *never* presented the McNair Memorandum to this Court for *in camera* review to determine whether the defense might have a right to discover it. In short, Swenson, upon his return to San Francisco, buried the McNair Memorandum in his own files.[16]

---

15. This was not the only such representation Swenson made to this Court. On February 24, 1989, Swenson filed with this Court a document that contained the following assertion:

> The United States is very much aware of its obligation to turn over to a defendant's counsel exculpatory information or evidence when it is known to the United States. In this case, as we have already advised the Court and defendants' counsel, the United States is unaware of any exculpatory information or evidence relating to the defendants. *We will, of course, disclose any such material if we become aware of its existence.*

(Ex. 253 at 3:20–26 (emphasis added); *see also* Ex. 260 at 2:23–3:7; *id.* at 6:21–23 ("[T]he United States is doing everything humanly possible to provide defendants' counsel with any information at all relevant to this case, including witnesses and documents."); Ex. 306 at 1:23–25 ("[T]here does not exist, to the knowledge of the United States, any 'Brady' material that has not already been provided to defendants' counsel."); Ex. 280 at 10:6–9 ("[I]t did not even occur to the United States to inquire of the Chinese officials as to whether there existed any other written statements or interviews of Wang Zong–Xiao.").)

16. At trial, Swenson attempted to justify his failure to produce the McNair Memorandum to the *Leung* defense counsel. He testified that, based on Boucher's statement, "I shouldn't have this," that Boucher had given Swenson the memorandum in confidence; Swenson also testified that, in his opinion, there was no exculpatory information in the McNair Memorandum and, consequently, he had no duty to turn the memorandum over to defense counsel. (Tr., Apr. 15, 1993, at 618:22–620:9.)

The latter explanation (no exculpatory information) is considered in detail (and found wanting) in the Court's Conclusions of Law. *See* Section III.B.2, *infra.* It also is significant that Swenson, during an April 9, 1992, meeting with *Leung*

Swenson was not the only member of the American prosecution team who knew that Inspector Boucher had obtained a videotape of one of Wang's interrogations. As discussed above, Harris learned of that fact almost a year earlier, shortly after the Goldfish arrests. *See* Section B, *supra.* Harris discussed the videotape with Cahill in August 1988. *See* Section D, *supra.* What is more, Swenson first learned of the videotape's existence *before* he received the McNair Memorandum. Boucher mentioned a videotape of Wang during Swenson's May 1988 trip to Hong Kong, *see* Section B, *supra,* and Harris and Swenson discussed the videotape sometime in *1988.* (Tr., Apr. 19, 1993, at 867:23–868:11.)

On March 23, 1989, after his return to San Francisco, Swenson summarized his trip to Shanghai and Hong Kong in a letter to Joseph Krueger, the Special Agent in Charge of the San Francisco DEA Field Office. (Ex. AF.) Copies of that summary were sent to the United States Attorney, Harris, and DEA and Justice Department officials in Washington, D.C. (*Id.* at 11.)

On April 3, 1989, Swenson sent Harris a letter, attaching to it a list of questions for the PRC police officials who were to testify at the *Leung* trial. (Ex. AG.) On that date, it appeared that the Goldfish trial would commence in this Court sometime in May 1989. In his letter to Harris, Swenson set out his understanding of the government's obligations with respect to allowing *Leung* defense counsel to question Wang:

> As you know, we are under an obligation, because of a court order from Judge Orrick, to make defendant Wang "available"

to be interviewed by defendants' counsel one week prior to trial. Of course, being ordered to make the witness "available," does not require that the witness answer any questions from defendants' counsel. *That decision is strictly up to the witness and whatever counsel he may have.* We, as the prosecutors, are not permitted to advise a witness to not answer questions from defendants' counsel, but it is also our obligation to advise witnesses that the decision to speak with a defendant's counsel is entirely his own.

(*Id.* at 1–2 (emphasis added).) When Wang eventually came to the United States in late 1989, Swenson advised him that he did not have to speak with defense counsel.

Harris later told Swenson he had given the questions attached to the April 3 letter to the PRC officials. Harris had no further communications with any PRC official regarding the list of potential questions. Among sixteen pages of possible questions, *one* page summarized the possible cross-examination of *one* officer (Zhu) on the topic of "the treatment given Wang" and "any promises or threats given to him."[17] (*Id.* at 15.)

On April 4, 1989, Swenson wrote the Department of Justice, seeking authorization to bring six witnesses from the PRC to testify in the Goldfish case. (Ex. 103.)

In June 1989, prodemocracy demonstrations took place in China; those demonstrations culminated in what quickly came to be known as the "Tiananmen Square Massacre," a massive and bloody crackdown by PRC authorities. Swenson was aware of the Tiananmen Square Massacre; indeed, Swenson maintained a file of clippings from news pub-

---

defense counsel, expressed his disgust with the Civil Division of the United States Attorney's Office for producing the McNair Memorandum in connection with this litigation; Swenson also remarked to defense counsel that the McNair Memorandum is "technically Brady material." (*See* Ex. 186.)

The former explanation (Boucher provided the memorandum in confidence) is unworthy of credence for one simple reason: Swenson *never* showed the McNair Memorandum to *any* person in the United States Attorney's Office or the Department of Justice. Swenson attempted to justify this lapse with the following explanation: "First I didn't feel that it was something I needed to do. It wasn't information that had anything

to do with our prosecution of the case. We had already long since indicted our case, and were ready to go to trial on it." (Tr., Apr. 15, 1993, at 620:12–15.) The Court is wholly unpersuaded by Swenson's testimony in this regard.

17. Defendants, asserting the attorney-client privilege, redacted significant portions of the questions in Exhibit AG. The Court ruled that defendants could maintain the privilege, but only at the cost of the inference that the only cross-examination questions in the document are the ones that appear on its face, as it was received in evidence. (Tr., Apr. 15, 1993, at 656:8–657:20.)

lications regarding the events in Tiananmen Square.[18] (Ex. 426.) Swenson also was aware of, and had read, a Department of State report that was critical of human rights conditions in the PRC. During the pendency of the Goldfish case, Swenson did not alter in any way his plan to use Wang as a witness because of either the Tiananmen Square Massacre or the Department of State report.[19]

The Tiananmen Square Massacre had repercussions at the American Embassy in Beijing. During June 1989, the PRC placed extra armed personnel outside the Embassy and, at one point, PRC military officers fired on an American diplomatic compound. In response to this and other events, Keith drafted a series of recommended actions for the Embassy to take. Among these was a recommendation that the United States suspend temporarily its bilateral cooperation on narcotics matters, such as the Goldfish case.

Keith destroyed his own files on the Goldfish case during the week of June 6, 1989, in response to a "political crisis" at the Embassy. The Americans were fearful that the Chinese police might enter the Embassy and, consequently, they destroyed a large number of their files.

F. *The September 1989 Trip to Shanghai.*

In the spring of 1989, the *Leung* defense counsel stepped up their efforts to obtain discovery from the PRC witnesses who would testify against their clients. In March, Gilbert Eisenberg, who represented Leung, and James Larson, who represented Chico Wong, traveled to Hong Kong to interview witnesses and obtain evidence. (The remaining defendant, Andrew Wong, was represented by Richard Mazer; Mazer did not accompany Eisenberg and Larson to Hong Kong in March 1988.) The two defense lawyers made requests, via a Hong Kong investigator, for evidence and records from the Hong Kong police. (Ex. 96.) The Hong Kong police

denied the request and suggested that the attorneys direct their inquiries to the United States Attorney's Office in San Francisco. (Ex. 99.)

Eisenberg and Larson then traveled to Shanghai. While he was in Shanghai, Larson notified Swenson that the PRC police officials said two defendant witnesses, including Wang, were not in custody in Shanghai; Larson asked Swenson to inform him of their whereabouts. (Ex. 95.) Swenson did not respond to Larson's request. Eisenberg and Larson's trip to Hong Kong and Shanghai yielded no evidence for their case.

On May 2, 1989, Swenson wrote Keith at the American Embassy in Beijing, informing him of this Court's Order "authorizing the defendants' counsel to seek to obtain, at a minimum, through Letters Rogatory, depositions of certain witnesses in Shanghai." (Ex. 107 at 1.)

In September 1989, Eisenberg and Larson returned to Shanghai to interview the witnesses in PRC custody. Mazer accompanied them on this trip; Swenson did not travel with the defense counsel, but joined them in Shanghai and was present during their interviews of PRC witnesses. When the defense counsel arrived in Shanghai, Yuan met with them and explained a set of "ground rules" for the interviews. Yuan told the attorneys to stick to the facts of the case and to avoid asking questions regarding any surrounding circumstances. Larson understood that Yuan would not permit any questions regarding the conditions of the witnesses' custody or the voluntariness of their confessions.

Yuan was the PRC official responsible for arranging the depositions; Yuan served as the Shanghaiese interpreter, and he also secured the services of a video operator to record the interviews. During each interview, Yuan sat closest to the witness. The *Leung* defense counsel retained the services of a Mandarin interpreter. One of the de-

---

**18.** The parties stipulated that these documents are relevant only to Swenson's state of mind. (*See* Tr., Apr. 14, 1993, at 476:8–18.)

**19.** At some point prior to December 1989, Swenson received and read a Department of State cable, which stated that, partly because of the MPS's role in the Tiananmen Square Massacre,

American law enforcement exchanges with the PRC would "be considered on a case-by-case basis." (Ex. 115 ¶ 3.) That same cable also said that ongoing prosecutions, including "the 'Goldfish trial,'" would be permitted to continue. (*Id.* ¶ 4.)

fense counsel would ask a question, their interpreter would translate the question into Mandarin for Yuan, who then would translate the question into Shanghaiese for the witness; the answers traveled back along the same chain of interpretation.

In addition to interviewing Wang, the defense counsel also interviewed three civilian witnesses, including Guan Cai Yun ("Guan"). Guan was also known as the "fish lady," because she and her husband (whom defense counsel also interviewed) sold Wang the goldfish that were used in the smuggling operation. During Eisenberg's questioning of Guan, he asked her whether PRC police officials ever detained her husband. Yuan objected to the question. Swenson told defense counsel he did not think the question relevant to the case against their clients. At another point during the deposition, Eisenberg stated his observation that Guan was smiling at one of the PRC police officers. This remark agitated Yuan. Yuan had similar reactions to the attorneys' questioning of other witnesses.

The defense attorneys had expressed to Yuan their interest in interviewing two other witnesses: Wu Hui Min, who had been involved in the goldfish shipments, and Hui Sik Wah. Over the next several days, the PRC police officials offered various excuses as to why these two witnesses were unavailable for deposition; with each succeeding excuse, the attorneys became convinced the PRC officials did not want them to interview these individuals. Swenson was aware of the defense attorneys' requests to see these witnesses, but, to the attorneys' knowledge, did nothing to encourage the PRC police officials to make the witnesses available.

Swenson was not the only American law enforcement representative who traveled to China in early September 1989 in connection with the Goldfish case; Harris also went to Beijing. While there, Harris met with Liu Zhi Min and Wang Qianrong, who assured Harris of the PRC's continued willingness to allow Wang to testify in the United States. Wang Qianrong also told Harris that the time was rapidly approaching when the MPS would have to turn Wang over to the Chinese court system. Wang Qianrong also remind-

ed officials in the American Embassy that, once the Chinese court system obtained jurisdiction over Wang, he would not be available to travel to the United States. (Ex. 131 ¶ 2.)

The urgency of commencing the Goldfish trial in the United States also was made clear in a November 22, 1989, cable, which Aloisi drafted, from the Shanghai Consulate to, *inter alios*, Swenson and Harry White, an official in the Department of Justice:

> 2. Shanghai PSB witnesses are increasingly frustrated at the delays [in the American trial date], and await official word from Beijing on their availability to travel early next year if trial is further delayed. Please note, however, that Chinese witnesses will be extremely reluctant to be away from China during the January 27–31 Chinese New Year/Spring Festival holiday. PSB witnesses strongly prefer to travel in December. We suggest that Swenson press for a split trial beginning in December. Failing this, he could ask for a continuance until after the Chinese New Year. *Please note, however, that delay in the San Francisco trial continues to affect, and greatly complicates, the trials of Goldfish defendants in China.*

(Ex. 130 ¶ 2 (emphasis added).)

The American government thereafter made a formal request to have the PRC defendant witnesses, including Wang, brought to the United States in late December 1989. (Ex. 138.) Although the trial was not scheduled to commence until January 1990, the United States made this request to avoid having Wang transferred to the Chinese court system. On December 8, 1989, the MPS approved the American request. (Ex. 139 ¶ 2.)

While he was in Beijing, Harris also met with Ambassador Lilley, Michael Meserve, the Second Secretary in the American Embassy, and Lynn Pasco, the Deputy Chief of Mission. Harris expressed his view that the American cooperation with the PRC police should continue, and he also indicated he felt sympathetic to the PRC police in light of the events in Tiananmen Square. Meserve arranged for, and attended, a subsequent meet-

ing with Harris, Wang Qianrong, Liu Zhi Min, and Yuan. During the course of that meeting, Harris expressed his opinion, as a law enforcement officer, that the events in Tiananmen Square should not jeopardize the cooperation between the American and Chinese governments at cracking down on heroin smuggling.

### G. The Goldfish Trial.

In December 1989, the Shanghai Consulate assisted in arranging Wang's travel to the United States. On November 21, 1989, the Consulate sent a cable to the Department of State, requesting "expedited parole authorization" for Wang. (Ex. AI ¶ 3.) The CORAP parole officer logged this request.[20] (Ex. AN at 2.) On November 22, the Department of State issued a "Visas 91," authorizing a thirty-day parole for Wang, to commence November 24, 1989. (Ex. AJ ¶¶ 1, 3.) On December 20, 1989, the Department of State advised the Consulate that the starting date for Wang's thirty-day parole had been changed to December 27, 1989. (Ex. AL.) The Consulate issued Wang's boarding letter on December 26, 1989. (Ex. AM.) The I–94 form also issued on December 26, 1989. (Ex. AO.)

Shortly before Wang left the PRC, Aloisi gave Yuan a photocopy of the immigration parole statute. Aloisi did this to assure Yuan that Wang could not apply for asylum once he arrived in the United States.

Sometime around December 25, 1989, PRC police officials told Wang he would be going to the United States to testify. They reminded him he was to stick to the version of events in the April 21 interrogation statement, and instructed him to refuse to speak to persons other than the American prosecutor. The PRC police told Wang that if anyone asked whether he had confessed voluntarily, he was to give an affirmative answer.

Wang arrived in San Francisco on December 27. Five Chinese police officials accompanied him: Yuan, Wang Qianrong, Zhu Yi-Zhong, Huang, and Kang. Wang was taken to the Pleasanton Detention Center ("Pleasanton").

Swenson met with Wang in late December 1989. It was during this meeting that Swenson explained to Wang his obligations as a witness in a court of law in the United States. Any prior discussions Swenson may have had with Wang regarding these obligations, were, by Swenson's own admission, "very limited." (Swenson Depo. at 296:14.)

A few days before the start of trial, Aiu and Yuan traveled to Pleasanton to visit Wang; Rozario drove them to Pleasanton. At Pleasanton, Yuan and Wang had a brief conversation in Shanghaiese; Yuan did not translate the substance of that conversation for Aiu. Swenson was aware that Aiu made this trip; Swenson also was aware that the PRC police officials who accompanied Wang to San Francisco visited Wang on other occasions. Swenson never requested that the officers have their conversations with Wang translated to the DEA agent who escorted them to Pleasanton.

Swenson had assumed all along that Wang's credibility as a witness and, specifically, whether his statements were coerced, would be an issue with defense counsel. Swenson never filed with this Court a motion *in limine* to prevent *Leung* defense counsel from asking Wang whether he had been mistreated. More important, Swenson never asked Wang whether he had been mistreated or whether his statements were coerced. Swenson also made no attempt to contact or interview the PRC police officials who arrested Wang on March 12, 1988.

The *Leung* defense counsel clearly had placed Swenson on notice that Wang's credibility as a witness would be a central issue in the criminal case against their clients. They filed with this Court numerous memoranda, seeking to exclude PRC witness statements, depose witnesses, and compel discovery, in which the defense counsel set forth their views as to why the PRC witness' testimony was unreliable. (*See, e.g.*, Exs., 256, 258, 266, 267.) Swenson filed numerous oppositions to

---

20. As noted above, the CORAP parole officer, Jeffrey Trecartin, had logged the DEA's September 1988 parole request. (Ex. Y.) In September 1988, Trecartin also prepared a parole card for CORAP's files. (Ex. X.) Trecartin searched for, but was unable to locate, a parole card for the December 1989 parole request.

these motions. (*See, e.g.*, Exs. 253, 255, 257, 259, 260, 264, 268, 269, 274.) The *Leung* counsel strongly suspected that Wang had been tortured while in PRC custody; and they noticed, as Swenson and Aiu had noticed, *see* Section B, *supra*, the discrepancies between the March 14 and the March 19 statements regarding the delivery of the heroin.

The trial in *United States v. Leung*, commenced January 8, 1990. Wang Qianrong was the first witness to testify.

On January 9, Swenson and the *Leung* defense counsel met with Wang in Swenson's office. Before this meeting, Yuan told Wang that, in the event defense counsel asked him about conditions in the Chinese jail, he was to respond that the conditions were okay.

Wang Qianrong, Yuan, and at least two DEA agents were in the room at all times during this interview; Wang Qianrong served as interpreter. In response to questions from defense counsel regarding prison conditions, Wang followed Yuan's instructions and said he had been treated fairly in the Chinese prisons. He told the *Leung* defense counsel he had not been beaten in prison. When the defense counsel asked about interrogations, however, Wang said that he had been interrogated at length on the day he was arrested; he also said the PRC police officials interrogated him many times and that someone was taking notes at each interrogation session. Thus, it became apparent that Wang had given statements to the PRC police officials that had not been given to the American prosecution team or to the *Leung* defense counsel. The defense counsel immediately asked Swenson to obtain the additional statements.

At the close of the January 4 meeting, Wang Qianrong remarked to Swenson that things had appeared to go well.

At some point when the *Leung* trial was underway, the PRC police officials gave Swenson copies of interrogation minutes that had not been provided previously to the American prosecution team. The statements were in Chinese; Swenson had them translated into English. Among these newly received minutes was a set dated March 15, 1988. (Ex. 5.) This set of minutes includes the following exchanges:

Question: *We have been explaining and educating you about our policy the whole afternoon.* We wish you could heed the advices [*sic*] given by the government workers and give a detail [*sic*] and total account of what actually happened. *This concerns your future with life and death significance.*

Answer: After your education in the afternoon, especially when you mentioned "any cover-up[,] be it intentionally [*sic*] or inadvertently made, would overwhelm you in its consequences," I feel the rationale behind it. There has been one thing I had not thought of correcting, thinking not much difference from what I had said. But now, on second thought, I had better have it corrected. I would ask your permission to make the correction, if you so desired.

Q. We welcome your timely correction for any untruth you had previously told.

A. It concerned the story of the two Hong Kong guys' delivery of Heroine. The truth was: in the middle of January of 88, I called Leung DeLun of Hong Kong, asking him when would he be back to Gaungzhou. He replied through the telephone that the persons responsible of [*sic*] delivering the heroine had been in Gaughzhou [*sic*], staying in the Oriental Hotel room 519. Since I did not know them personally, Leung then asked me to meet Leung the next day on a Kowloon thorough train at the train station. The next day five O'clock or so when I met Leung, we wnet [*sic*] directly to the Oriental Hotel Rm 519. *There were three persons in the room, one was called Ah Kun, the other was lean and tall, the two were Hong Kong guys, there was another dark thin person, a Guangzhou native. A deal was struck at 490,000 HKS for seven pieces of heroine. Leung De–Lun only paid 460,-000 HKS, with a negatice [*sic*] balance of 30,000, which Leung promised to pay in Hong Kong. Then the one tall lean guy and the dark thin one Guangzhou guy went to fetch the heroine.*

. . . .

Q. How did you convert them into powder afterwards?

A. *Leung De-Lun and I crushed them with a hammer,* in Leung De-Ming's place. Since they had been in powder form before being hard pressed into solid form for convenience sake in travels, they were easily reduced into powder again with one stroke of the hammer.

That is what I want to have correction on. I wish you believe my motive for the correction.

Q. *We welcome your correction made today [sic], we can also understand your motive for the correction, if you do speak truthfully. But one point we must warn you on, in the entire process of smuggling heroine, you must give a clean breast of what happened,* (including corrections). *All corrections must be made this evening, and no questions will be asked. Beyond this period, you shall have to bear all consequences.*

(*Id.* at 1–2 (emphasis added).) Hence, Wang's March 15 statement was consistent with his March 19 statement, and inconsistent with his March 14 statement, insofar as both the March 15 and 19 statements (1) placed Leung at the scene of the heroin delivery and (2) included Leung's role in the breaking up of the heroin. The PRC police officials also gave Swenson Wang's April 21, 1988, interrogation statement. (Ex. 10.) Swenson gave all the newly-produced interrogation minutes to the *Leung* defense counsel.

On January 26, Rozario drove Yuan and Wang Qianrong to Pleasanton to see Wang. During a brief conversation, all of which took place in Chinese, Yuan told Wang what he was to say on the witness stand regarding the facts leading up to his arrest. Yuan also told Wang that, were he to be asked, he should testify that his confession was voluntary. Yuan instructed Wang that the goal in China *was to educate suspects,* whereas American courts placed a premium on voluntariness.

On January 29, Wang was brought to the Federal Building in San Francisco for the purpose of reviewing his trial testimony, which was scheduled to commence the following day, with Swenson. Aiu recalls Swenson reviewing with Wang the substance of his testimony on direct examination. Once again, Swenson did not ask Wang any questions about his treatment in the PRC.

Swenson called Boucher during his case-in-chief. Boucher testified, *inter alia,* that the PRC had provided his office with Wang's interrogation statements and at least one videotape of one of Wang's statements. On January 29, Eisenberg asked the Court to order the government to obtain and produce *all* PRC witness statements, including any videotapes. Swenson, who had received and read the McNair Memorandum, made the following representation to this Court: "I don't know about any video." (Ex. 200 at 702:17.)

On January 30, Swenson called Wang as a witness. Shortly after Wang took the stand, Swenson asked him whether he knew Leung. Wang then asked if he could "make a personal request to the Judge[.]" (Ex. A at 762:8.) The Court agreed to "indulge" Wang and excused the jury. (*Id.* at 762:19–24.) Wang thereafter engaged the Court in a colloquy. Because of Wang's comments, the Court asked whether he wished to have counsel appointed for him; when Wang answered in the affirmative, the Court called a recess over the noon hour.

The Court ordered that the United States Marshals Service ("Marshals Service") take Wang to the holding area on the twentieth floor of the Federal Building. (Ex. 201 at 777:20–21.) While the Court was in recess, however, Swenson directed the Marshals Service to bring Wang to his office. Besides Swenson and Wang, Aiu, Harris, Yuan, and Wang Qianrong were present at that meeting. Yuan spoke in a loud, angry tone of voice to Wang for about fifteen minutes; the conversation was in Shanghaiese and, hence, *the Americans could not understand what Yuan was saying.* Wang recalls Yuan telling him he "probably got dizzy after eating a month of bread in America," and instructing him not to ask the Court to appoint counsel on his behalf; Yuan also reminded Wang that once he returned to China, "your life is

in our hands." (Tr., Apr. 22, 1993, at 1229:4–1230:7.)

At one point, Swenson said to Wang, "you don't need a lawyer, because I'm your lawyer." (Tr., Apr. 8, 1993, at 185:12–15.) Swenson also told Wang that he would not be in a position to assure Wang of leniency in the PRC were Wang represented by counsel. Wang indicated to Yuan and Swenson that he would return to Court and say he did not want a lawyer. Later in the day, Swenson repeated to Aiu his understanding that he, Swenson, was Wang's lawyer.

Later that day, the Court appointed Cedric Chao of Morrison & Foerster and Barry Portman, the Public Defender for the Northern District of California, as counsel for Wang.

On the afternoon of January 30, after the trial adjourned for the day, the two PRC police officials, Yuan and Wang Qianrong, told Aiu that they did not understand the nature of the American legal system, that they considered Wang their prisoner, and that they wanted to take him back to the PRC forthwith.

The following day, January 31, a meeting with all interested counsel took place in Swenson's office. Wang, Swenson, Aiu, Harris, Wang Qianrong, Yuan, Portman, Chao, and Molly Isham, a court-appointed interpreter, were present. This meeting was transcribed by a court reporter, and consisted mainly of arguments between Portman, on one side, and Swenson, Yuan, and Wang Qianrong, on the other, regarding Swenson's attempt to meet with Wang outside the presence of his newly-appointed counsel. (Ex. 202.) Later that day, Yuan had an opportunity to meet alone with Wang. Yuan was quite angry, and told Wang that when he returned to China, he would be dealt with severely.

On February 1, Wang returned to the witness stand. While he testified, Wang Qianrong and Yuan were present in the courtroom. Wang testified that Leung *was* present at the delivery of the heroin. This was not truthful testimony. Wang gave this testimony on February 1, as he had done during his post-March 14, 1988, interrogations in the

PRC, because he feared the retribution he would face from the PRC police for telling the truth. Wang testified again on February 5; again, he placed Leung at the delivery of the heroin.

Wang's final testimony was given on February 13 and 14. On those two days, Wang changed his story and testified that Leung was *not* present when the heroin was delivered. Two things of note occurred during the intervening eight days. First, the Court, on February 7, held a hearing on Wang's motion for a preliminary injunction barring his return to the PRC; as a result of the events at that hearing, Wang decided it was safe for him to tell the truth in a United States courtroom. Second, Swenson visited Wang alone in one of the Marshals Service holding cells, over the objections of Chao and Portman; Swenson never told Wang that Chao and Portman were outside the cell and wished to see him. Wang told Swenson that, when he returned to the witness stand, he would testify that Leung had not been present at the delivery of the heroin.

At the conclusion of the February 7 hearing on Wang's motion for a preliminary injunction, Yuan and Wang Qianrong expressed to Harris their displeasure at the Court's action. Harris remarked to them that each country handles asylum-type matters in its own way, and that Wang's application for asylum was "the risk of the business." (Tr., Apr. 19, 1993, at 883:11–884:4.)

On February 9, 1990, Eisenberg, on behalf of all three *Leung* defendants, wrote to Swenson, expressing concern that the PRC police officials who accompanied Wang to the United States might be recalled to China. (Ex. 155.) Eisenberg recounted that an article to that effect had appeared in that morning's edition of the *San Francisco Chronicle*. (*Id.* at 1.) Eisenberg requested that Swenson attempt to ensure that neither Yuan nor Wang Qianrong would leave the United States, because Eisenberg intended to call them to testify in light of Wang's statements in his asylum application. (*Id.*)

Later that afternoon, Swenson spoke with Eisenberg and informed him that Yuan and Wang Qianrong had departed for the PRC on February 7 or 8. On February 11, how-

ever, Swenson telephoned the Chinese Consulate in San Francisco to confirm dinner arrangements with both Yuan and Wang Qianrong. An individual at the Chinese Consulate informed Swenson that Yuan and Wang Qianrong had departed for the PRC *that day,* February 11. Hence, Swenson's February 9 representation to Eisenberg that, as of that date, Yuan and Wang Qianrong already had left for the PRC, was not truthful.

H. *The Immigration Proceedings.*

On February 5, 1990, Wang filed a request for asylum with the INS. (Ex. 330.) Benjamin Safir, an attorney with Morrison & Foerster, presented Wang's application; Terry Rice, an INS Immigration Examiner, eventually accepted the application from Safir. (Ex. 331.) Rice took handwritten notes regarding Wang's application on the afternoon of February 5. (Ex. 171.)

Before he would accept Wang's application, Rice placed a few phone calls from the office of Jean Hemphill, Assistant Director for Examinations. First, Rice telephoned Glen Robinson of the Marshals Service, whose name Safir had given to Rice when the latter inquired why Wang was not there to present his asylum application in person. Robinson referred Rice to Swenson, whom Rice then telephoned.

Swenson expressed to Rice his displeasure that Wang had filed an asylum application. When Rice asked why Wang could not come to the INS office to file his application, Swenson told Rice that Wang was a witness in a pending drug trial. Swenson also told Rice that Wang had pleaded guilty to smuggling heroin. From Rice's contemporaneous notes, it appears that Swenson initially told him that Wang's purported guilty plea had been given to the Chinese courts; Rice crossed-out the reference to "Chinese courts," and wrote in its place "to Bureau of public security." (*Id.*) Rice also jotted down a reference to 18 U.S.C. § 3508. (*Id.*) Swenson, who had discussed the possible relevance of this statute with a Justice Department lawyer, Thomas G. Snow, on February 1 or 2, 1990, suggested to Rice this code section might apply to Wang's asylum application.[21] Up through January 30, 1990, Swenson had *never* discussed the possibility of Wang applying for asylum with any PRC official.

Rice then spoke with one of his INS superiors, who told Rice he would have to accept Wang's asylum application. Rice followed this directive, noting on the receipt that Wang's documents were "accepted contingently with understanding that we will notify attorney of record in the event that this service does not have legal jurisdiction in this matter." (Ex. 331.)

Later that day, February 5, Swenson called Hemphill to inquire about the status of Wang's asylum application. Swenson told Hemphill that Wang was a witness in an ongoing drug trial, that he had no knowledge of Wang's involvement in any political movement, and that he did not see any basis for Wang's asylum request.

The next day, February 6, Swenson received authorization from the Court to ask Wang if he would meet with him, Swenson, alone. When Swenson went to the Marshals Service office, Wang's counsel, Chao and Portman, were outside the door.[22] Chao and Portman objected vociferously to Swenson's meeting with their client alone. Swenson and Chao engaged in a heated argument, after which Swenson refused to allow Chao

---

21. The fact that Swenson and Snow discussed § 3508 on February 1 or 2, 1990, flatly contradicts Swenson's September 31, 1990, declaration, submitted under oath to this Court, in which he stated he "was not even aware that [§ 3508] existed until February 6, 1990" (Ex. 283 ¶ 5 (emphasis added)), and his further representation to this Court that Snow was unaware of § 3508 prior to February 6, 1990. (*Id.* ¶ 6.) In addition, Swenson and Aiu discussed § 3508 at some point *before* the date Wang arrived in San Francisco for the trial, i.e., December 27, 1989. (*See* Tr., Apr. 8, 1993, at 168:12–172:16.) Swenson's testimony contradicted Aiu's testimony on

this issue. (*See,* Tr., Apr. 14, 1993, at 499:17–503:3.) The Court finds Aiu the more credible witness on this point.

Snow had knowledge of the Goldfish case from its inception. (Ex. 36 at 5.)

22. During this or another conversation, Chao and Portman asked Swenson the statutory basis for having Wang brought to the United States. Swenson told them that Wang had been paroled into the United States; Swenson also handed to Chao and Portman a photocopy of 18 U.S.C. § 3508, and told them that it might also apply.

and Portman to accompany him to see Wang. Swenson had a brief conversation with Wang, during which he did not tell Wang that his counsel were standing outside the door.

At about the same time Chao and Swenson were arguing, Rice arrived to interview Wang. Although it was unusual for an asylum officer to interview an applicant so soon after he filed his application, Rice's superiors instructed him to interview Wang on February 6 at the Federal Building.

Also on February 6, the Department of State sent a cable to the American Embassy in Beijing and the Consulate in Shanghai that included the following paragraph:

2. Assistant U.S. Attorney informed Department late yesterday that Wang Zong Xiao has filed asylum request with INS District Director in San Francisco. Wang has also filed lawsuit against [the United States government] for violation of his constitutional rights. Asylum interview before INS District Director is scheduled for today, and a hearing on the constitutional claims will be held tomorrow. The [Goldfish] trial has been suspended until tomorrow's hearing. *INS is confident it will find Wang ineligible for asylum under U.S. law, but Wang's lawsuit could drag on for weeks, if not months. We cannot predict the outcome of the civil suit.*

(Ex. 151 ¶ 2 (emphasis added).)

Within two days of the February 6 interview, Rice requested an advisory opinion on Wang's application from the INS's Bureau of Human Rights and Humanitarian Affairs ("Bureau"). This request, too, was an unusually fast one for an asylum application. The Bureau sent back a "sticker response," indicating that the decision on Wang's application would be left to the District Director. At some later time, Rice requested from the Bureau another advisory opinion.

Rice's interview of Wang on February 6 was quite brief. He thereafter conducted another interview, on March 27, 1990. David Ilchert, the District Director, Leonard Rosenberg, the Assistant District Counsel, Maria Fernandez, another INS employee in the asylum unit, and Hemphill also attended the March 27 interview; an attorney from INS headquarters in Washington, D.C., also participated, via telephone.

Rice prepared the initial draft of the intent to deny letter; Rosenberg did the revisions. While Rice was preparing this letter, Rosenberg asked him to obtain certain information from the DEA. In three years of working on asylum applications, Rice had never before worked with Rosenberg on an application.

On July 29, 1991, Ilchert denied Wang's application for asylum. (Ex. 345.)

In January 1992, INS headquarters orally instructed Ilchert to commence exclusion proceedings against Wang. On February 11, 1992, the Associate Commissioner for Examinations memorialized these instructions in writing. (Ex. 352.) On February 18, 1992, the INS initiated exclusion proceedings against Wang by filing two charging documents, INS forms "I–122" and "I–110." (Exs. 354, 355.) Rosenberg reviewed a draft of each charging document several weeks before the INS filed them. At that time, Rosenberg made substantive changes to the drafts; although he again reviewed the documents prior to February 18, he made no additional substantive changes.

On February 18, 1992, the INS also served Wang with notice that his parole had been terminated. (Ex. 356.) Rosenberg also reviewed this document prior to February 18. All three of these documents—the I–122, the I–110, and the parole termination letter—had been finalized by February 12, 1992.

Prior to February 18, 1992, various individuals in the INS District Office, including Rosenberg, discussed the date for filing the charging documents and the probable hearing date the Executive Office for Immigration Review ("EOIR") in San Francisco would assign for the exclusion proceedings.

On February 13 or 14, Ronald Le Fevre, the INS District Counsel, telephoned Alec Revelle, a management officer in the EOIR, to inquire about the hearing date the EOIR would assign if the District Office filed the charging documents on February 18. This was an unusual telephone call, the first regarding an exclusion proceeding that Revelle ever had received from Le Fevre. Although Le Fevre may or may not have mentioned

Wang's name, Revelle understood that Le Fevre was calling regarding Wang's case, which had received coverage in the local press.

Le Fevre told Revelle that, because of transportation difficulties, the hearing had to be scheduled for a Thursday or a Friday. Revelle told Le Fevre that if the INS filed the charging documents on February 18, the hearing date most likely would be on February 21.[23] Le Fevre mentioned to Revelle that the alien in question was in the custody of the Marshals Service; he did not, however, tell Revelle that the Marshals Service would need several days advance notice before any hearing. Le Fevre also did not mention to Revelle that the alien in question would need an interpreter. Wang's I–110 clearly indicates that a Shanghaiese interpreter would be needed for any hearings. (Ex. 355.) Le Fevre discussed with Rosenberg the substance of his telephone conversation with Revelle.

At no time before or after his conversation with Revelle did Le Fevre ever speak with anyone from the Marshals Service. On February 14, 1992, Le Fevre wrote to Reginald Boyd, United States Marshal for the Northern District of California, informing him that (1) the INS would commence exclusion proceedings against Wang on February 18, 1992, and (2) the first hearing in that case would likely take place on February 21, 1992. (Ex. BC.) Prior to February 14, Le Fevre had spoken with Craig Raynsford, of the INS's General Counsel's Office; Raynsford informed Le Fevre that the Marshals Service would need a few days notice before any hearing so as to arrange transportation for Wang.

Le Fevre made the decision that the charging documents should be filed on February 18. Thereafter, Rosenberg directed the immigration inspectors to file the charging documents on that date. When he issued those instructions, Rosenberg understood the

government had reasons for wanting the charging documents filed on February 18.

Just over a year before his telephone conversation with Revelle, Le Fevre read a story in *The Recorder,* a San Francisco legal newspaper, that reported on the variation among Immigration Judges in terms of the frequency with which they granted asylum applications. (Ex. 350.)

February 18, 1992, was a Tuesday; February 21, 1992, was a Friday. In February 1992, the San Francisco EOIR maintained a calendar for the scheduling of initial hearings for "custody" matters, i.e., those cases involving aliens in INS custody. (Ex. 351.) When the INS filed an I–122 in a custody matter, the EOIR's computer would assign the initial hearing to the first available hearing day; the EOIR scheduled fifteen custody hearings per day in February 1992. Five Immigration Judges shared the responsibility for custody hearings, with one Judge holding hearings on a specific day of the week. The Immigration Judge to whom the case was assigned at the outset would conduct all further proceedings involving that alien. In February 1992, Immigration Judge Bette K. Stockton conducted all Friday hearings. At the time he filed the charging documents, Rosenberg understood that, as a general rule, custody matters were scheduled for hearings before the first available Immigration Judge.

In February 1992, members of the immigration bar in San Francisco were aware of which Immigration Judges were assigned to each day of the week; hence, it was generally known among immigration practitioners, including lawyers at the INS District Office in San Francisco, who, at the time, initiated 90–95 percent of all filings with the EOIR, that Judge Stockton would conduct Friday hearings.

The initial hearing for Wang's exclusion proceedings was set for February 21, 1992, before Judge Stockton. On February 18, 1992, Rosenberg confirmed with the Marshals Service the date for Wang's hearing.

---

**23.** The Court notes that Le Fevre and Revelle contradicted each other on this point. (*Compare* Tr., Apr. 22, 1993, at 1291:20–1293:23 (Le Fevre's testimony that Revelle *did* give a tentative hearing date of February 21) *with* Tr., Apr. 26, 1993, at 1444:22–24 (Revelle's testimony that he did *not* give Le Fevre a tentative hearing date).) The Court finds Le Fevre's testimony more credible on this point.

(Ex. 357.) The initial hearing took place on February 21, 1992, and Wang's exclusion proceedings have, since that date, taken place in Judge Stockton's court.

About a week after Wang's case was assigned to Judge Stockton, she had a conversation with Harold Spar, a general attorney with the INS in San Francisco. Judge Stockton told Spar that she was concerned that the INS had manipulated the filing of the charging documents in Wang's case so that it would be assigned to her. Spar tried to explain that he did not think that was possible, but Judge Stockton made clear to him that she did not accept his explanation.

In January 1992, Judge Stockton had talked to several other Immigration Judges in San Francisco about her perception that a disproportionate share of cases were being filed with certain Immigration Judges. Judge Stockton and her colleagues speculated this may have been due to deliberate action on the part of the INS in San Francisco. At the time of her conversation with Spar, Judge Stockton also was aware that, as a general rule, if the EOIR needed to retain an interpreter through Berlitz, an outside service that provided interpreters, there would, on average, be a two-day delay in the date of the hearing. Judge Stockton also was aware that, as a general rule, the delay for getting an interpreter usually was three days in the event the charging documents were filed in the afternoon. The I–122 in Wang's case was filed on the afternoon of Tuesday, February 18, 1992. (Ex. 354.) Judge Stockton also had learned that Rosenberg made inquiries regarding the possible delay in Wang's case that would be caused by obtaining an interpreter from Berlitz.

Spar informed Le Fevre of Judge Stockton's remark that she felt the INS calendar may have been manipulated so as to have Wang's case assigned to her; Spar also told Le Fevre that Judge Stockton's concern was based on her understanding that she was developing a "conservative" reputation in asylum matters.

Le Fevre had at least one conversation with Revelle after it was made known in the legal press that Judge Stockton had expressed concern about the possible manipulation of the EOIR hearing calendar in Wang's case. Revelle called Le Fevre and told him that he did not share the concerns attributed to Judge Stockton in the press reports.

### I. Wang's Prospects if He is Returned to the PRC.

The situation Wang faces if he is returned to the PRC today is vastly different from the one he would have faced had he not been brought to the United States to testify at the Goldfish trial. The situation Wang would have faced can best be understood by referring to the eight-character Chinese phrase that appeared on the wall of Wang's interrogation rooms: leniency to those who cooperate, harshness to those who resist. Wang had cooperated with the PRC police authorities, and he, therefore, would have been treated with leniency. Today, Wang faces the harshest possible treatment in the event he is returned to the PRC.

Wang's present predicament stems from the vastly different natures of the two systems in which he was asked to provide testimony. The PRC's criminal justice system exists to vindicate the State's interests, not to guarantee the individual's rights. That criminal justice system is not concerned with questions of "guilt" or "innocence." Indeed, the PRC's legal system views an individual who protests, "I am innocent," as one who criticizes the State. The Chinese legal system has no right to cross examination, no presumption of innocence, and no right to discovery. Trials in cases with political overtones are, in the words of Professor Robert Berring, one of Wang's expert witnesses, "theatrical performances largely." (Tr., Apr. 5, 1993, at 60:11–12.) Dr. Ross Terrill, another of Wang's expert witnesses, testified that, in China, "[b]ecause the task of the law is to uphold socialism, the State cannot be wrong on any major matter. So the moment someone is taken into custody in China, the presumption that he's guilty is there." (Tr., Apr. 26, 1993, at 1355:8–11.)

An individual accused of committing a crime in China is, therefore, under enormous pressure to confess. The Chinese government views the confession as a necessary

element to confirming the State's view of the facts of a case.

The sentencing authorities in the PRC retain enormous discretion when meting out punishment. Sentences vary dramatically: a convicted individual may be executed or may be sent to a labor camp; he or she may be placed in isolation or may be placed in a severely overcrowded cell. In large part, the PSB determines the sentence of an individual convicted of a crime.

Wang committed a crime with very serious consequences in the PRC criminal justice system. At the time of his arrest, the prospects were very real that he would be executed for his role in the drug smuggling operation. Several factors, however, support the finding that Wang would have received a more lenient sentence, such as a term of years, had he simply remained in the PRC. First, it is significant that Wang was still alive, and that the PRC police were holding him in Shanghai, a metropolitan (as opposed to rural) area. More important is the fact that the PRC police officials permitted Wang to come to the United States. As Professor Berring pointed out, this fact suggests that the PRC police officials viewed Wang as "trustworthy." [24] (Tr., Apr. 5, 1993, at 77:23–78:2.)

It is impossible for the Court to determine the precise type of "leniency" the PRC criminal justice system would have shown Wang had he not come to the United States. Wang could have been sentenced to a term of years, ranging from five to twenty years in prison; the authorities also might have sentenced Wang to life imprisonment. The length of incarceration is only one aspect of punishment in the PRC. The other aspect is the condition of the prisoner's confinement. The PRC prison officials might have treated Wang poorly or relatively well, compared to other prisoners.

Wang had no choice in the decision whether to come to the United States; that decision was made for him by the PRC police officials. Once he entered the United States and took the witness stand, Wang was faced with an irreconcilable choice of serving the PRC police officials and providing false testimony, or to honoring his oath as a witness and testifying truthfully.

Because of his actions in the United States, Wang has forfeited any chance to receive leniency in the PRC criminal justice system. Wang's decisions to disobey the instructions he was given, to ask for an attorney, and to attempt to fight his return to the PRC, have proved to be a major embarrassment to the PRC. Indeed, shortly after Wang filed his asylum application, the MPS filed an official protest with representatives of the American Embassy in Shanghai. A spokesmen for the Chinese government termed the actions in this Court, a "wanton encroachment on China's sovereignty." (Ex. 154 ¶ 1.)

The prospects that Wang will be treated harshly if he returns to the PRC are magnified by the nature of his case. First, this is a truly unique case; Wang was the first prisoner the PRC allowed to travel to the United States for purposes of giving testimony in a criminal trial. Second, as Professor Berring explained, the PRC is extremely sensitive about foreign criticism of its internal legal system. The fact that Wang has talked openly in an American court of law about the harsh treatment he has experienced has generated tremendous feelings of ill will and dishonor on the part of those who run the Chinese criminal justice system. That Wang has spoken of the Chinese criminal justice system while on foreign soil has only multiplied his prospects for being treated severely if he returns.

If Wang returns to the PRC, he will be subjected to the harshest possible treatment. The most likely scenario is that the Chinese government will execute Wang. Wang's actions have violated the Chinese Constitution and the Criminal Law of the PRC; those actions, in all likelihood, have rendered Wang a "counterrevolutionary" in the eyes of the Chinese criminal justice system. The Chinese Constitution makes it "the duty of citi-

---

**24.** It is significant that defendants' expert, Professor Feinerman, also concluded that Wang would have received lenient treatment but for his coming to the United States and his subsequent acts. (*See* Tr., Apr. 26, 1993, at 1328:9–1329:5.)

zens of the [PRC] to safeguard the security, honour and interests of the motherland; they must not commit acts detrimental to the security, honour and interests of the motherland." (Ex. 338 at A00041.)

Article 90 of the Chinese Criminal Law provides that "[a]ll acts endangering the [PRC] committed with the goal of overthrowing the political power of the dictatorship of the proletariat and the socialist system are crimes of counter-revolution." (*Id.* at A00045.) Article 91 provides that "[w]hoever colludes with foreign states in plotting to harm the sovereignty, territorial integrity and security of the motherland is to be sentenced to life imprisonment or not less than ten years of fixed-term imprisonment." (*Id.*) Article 103 provides that "[w]hoever commits any of the crimes of counter-revolution mentioned above in this Chapter, except those in Articles 98, 99 and 102, *may be sentenced to death when the harm to the state and the people is especially serious and the circumstances especially odious.*" (*Id.* at A00049.)

Even defendants' expert witness, Professor James Feinerman, believes that Wang will be treated harshly if he returns to the PRC. While he believes the Chinese government is unlikely to execute Wang for his actions, Professor Feinerman does anticipate that the PRC would single out Wang for mistreatment upon his return:

> [I]t could involve everything from very severe beatings, kicking, things that could be quite harmful to his person, to the more subtle or psychological forms of harassment and intimidation, including long questioning, debriefing him about everything he did while in the United States, denial of sleep, in some cases of food and water as part of this process of interrogation.

(Tr., Apr. 26, 1993, at 1320:22–1321:3.) Professor Feinerman also testified that his opinion that the PRC will not execute Wang is contingent upon Wang's case receiving publicity, what Professor Feinerman termed Wang's "best guarantee" against execution. (*Id.* at 1335:10–16.)

Wang's prospects for severe treatment if he returns to the PRC are not lessened by the publicity his case has generated. Quite the opposite is true. The PRC likely views

that publicity as further insult to its criminal justice system; if the publicity surrounding Wang's case has any effect upon his treatment, it is likely to make it worse, not better.

In support of his assertion that it is unlikely the PRC will execute Wang if he returns, Professor Feinerman cited the example of a Chinese citizen who hijacked an airplane to Japan, but who was not executed when the Japanese government returned him to the PRC. (*Id.* at 1314:11–1315:25.) Professor Berring, however, correctly pointed to several reasons why that analogy is unhelpful. First, the Japanese government negotiated a written agreement with the Chinese to ensure the hijacker would not be executed upon his return. Second, while the PRC views hijacking as a serious crime, that crime does not implicate the values the Chinese criminal justice system cultivates to the same degree as do Wang's circumstances.

The Chinese government is unlikely to extend leniency to Wang because of his obligations to testify truthfully in an American court of law.

Defendants introduced a letter dated March 23, 1993, to the United States Attorney for the Northern District of California from Robert M. Perito, the Director of the Department of State's Office of Chinese and Mongolian Affairs. The letter reads as follows:

> This is to confirm that the Department of State intends formally to request the Government of China to show leniency in sentencing Mr. Wang in the event that his administrative and judicial efforts to remain in the United States are unsuccessful. Specifically, the Department of State would request that Mr. Wang be treated upon his return to China in a lawful, fair and humane manner, and that the Government of China not impose the death penalty.

(Ex. BG.) Defendants' expert, Professor Feinerman, could not state with any certainty an opinion as to the probable effect on Wang's treatment of a formal request for leniency by the American government.

The possible benefit to Wang of the Perito letter is virtually nil. This is not simply

because the letter expresses a present intent to make a future request (something far short of the agreement the Japanese negotiated when they returned the captured hijacker to the PRC). At a more fundamental level, the American government's "request" for leniency likely will have no effect whatsoever on the Chinese government. In the words of Dr. Terrill, "[n]o country in the world has such a zealous regard for its sovereignty and such an obsessive insistence that its domestic affairs not be, quote "interfered with," end quote, by foreigners as does China." (Tr., Apr. 26, 1993, at 1375:1–4.)

## III. CONCLUSIONS OF LAW.

In his first amended complaint, Wang stated twelve causes of action. As noted at the outset, this Court, by Memorandum Decision, dismissed Wang's eleventh cause of action, a petition for writ of habeas corpus. The remaining eleven causes of action, in the order Wang stated them, are as follows: injunctive relief pending final adjudication of asylum application, including federal judicial review (first cause of action), injunctive relief pending final adjudication of asylum application, including federal judicial review (second cause of action), violation of substantive due process (third cause of action), violation of the government's duty to protect its witnesses (fourth cause of action), breach of the government's duty to exercise ordinary care (fifth cause of action), equitable estoppel based on affirmative governmental misconduct (sixth cause of action), violation of 18 U.S.C. § 3508 (seventh cause of action), violation of procedural due process, alleging that § 3508 is unconstitutional as applied to Wang (eighth cause of action), violation of procedural due process, alleging that § 3508 is unconstitutional as applied to any prisoner from the PRC (ninth cause of action), violation of 8 U.S.C. § 1182 (tenth cause of action), and violation of the law of nations and international law (twelfth cause of action).

Wang has indicated that his first and second causes of action are no longer viable. (See Pl.'s Reply Post–Trial Br., filed June 3, 1993, at 4 n. 1.) Accordingly, judgment is granted to defendants on those two causes of action.

Defendants, as they have done since Wang instituted this lawsuit, contest this Court's jurisdiction over Wang's remaining claims. For the reasons set forth below, the Court again rejects defendants' arguments. The Court considers Wang's remaining causes of action seriatim.

### A. Jurisdiction.

Wang invokes the Court's jurisdiction pursuant to (1) the general federal question statute, 28 U.S.C. § 1331, (2) the Court's inherent supervisory powers to protect witnesses appearing before it, Wheeler v. United States, 640 F.2d 1116, 1123–24 (9th Cir.1981), and (3) the Alien Tort Statute, 28 U.S.C. § 1350.

Defendants renew their argument that the Immigration and Nationality Act's ("INA") exhaustion provision, 8 U.S.C. § 1105a(c), trumps all three bases for this Court's jurisdiction. Defendants also argue that the political questions doctrine independently divests the Court of jurisdiction to consider Wang's claims. These arguments are considered in turn.

### 1. Exhaustion of Administrative Remedies.

■ The INA bars "any court" from reviewing "[a]n order of deportation or of exclusion" unless "the alien has ... exhausted the administrative remedies available to him as of right under the immigration laws and regulations or ... has departed from the United States after the issuance of the order." 8 U.S.C. § 1105a(c). By Opinion and Order ("Opinion") filed June 15, 1992, the Court determined that § 1105a(c) presented no bar to the Court's exercise of jurisdiction with respect to Wang's eleventh cause of action, his petition for writ of habeas corpus.

The Ninth Circuit reversed and remanded with directions to dismiss the eleventh cause of action. Wang Zong Xiao, 979 F.2d 151. By its Memorandum Decision, the Court did just that. The Court also summarized the relationship between its Opinion and the Ninth Circuit's opinion, a summary that is not repeated here. (See Mem.Decision at 9:3–11:16.) The Court denied, however, defendants' motion to dismiss the eleven re-

maining causes of action. (*See id.* at 11:18–16:16.)

The Ninth Circuit's opinion in *Wang Zong Xiao* dealt only with Wang's eleventh cause of action, his petition for habeas corpus; that cause of action, unlike the remaining eleven causes of action in Wang's first amended complaint, implicated directly the INA's administrative procedures. The Ninth Circuit specifically stated that "[t]he issue before [the court was] whether the question of the INS' jurisdiction is appropriately decided in the first instance by the INS, or whether it is an issue beyond the authority of the INS to resolve and remedy." 979 F.2d at 154. Insofar as this Court's Opinion held that Wang need not exhaust his administrative remedies to press in federal court his eleventh cause of action, the Ninth Circuit reversed. *Id.* ("We agree with the government that the INS should be accorded the opportunity to determine its own jurisdiction.").

This Court's discussion of the INA's exhaustion requirement was *not,* however, limited to Wang's eleventh cause of action. The Court's jurisdictional analysis (which included an evaluation of defendants' exhaustion argument) applied to defendants' motion to dismiss Wang's *entire* first amended complaint. (Opinion at 16:5–25:20.) The Court's ruling as to the eleven remaining claims was not disturbed by the Ninth Circuit's decision, and consequently, it remains the law of the case. *See* 1B *Moore's Federal Practice* ¶ 0.404[1] (2d ed. 1992) (noting the general rule that "a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation").

There remains the question whether the Court's ruling on defendants' postremand motion to dismiss altered the analysis in the Opinion. At the close of Wang's case, defendants moved for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rule of Civil Procedure. (*See* Tr., Apr. 27, 1993, at 1545:12–1548:10.) Defendants' Rule 52(c) motion is based, in large part, on the Court's Memorandum Decision; specifically, defendants argue that the Court's reliance on *Wauchope v. United States Department of State,* 985 F.2d 1407 (9th Cir.1993), mandates

judgment in their favor on Wang's nonconstitutional claims. *Wauchope* distinguished *INS v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), holding that the latter case "precludes the judiciary from exercising its statutory powers of naturalization to redress *statutory* violations except in strict conformity with Congress' authorizing legislation. It does not speak to the courts' capacity to utilize traditional constitutional remedies to rectify *constitutional* violations." 985 F.2d at 1418.

This Court relied on *Wauchope* in rejecting defendants' argument that the INA's administrative proceedings could provide Wang with more efficacious relief (*viz.,* a grant of asylum) than could this Court. Wang argued then, and continues to argue now, that asylum is an inadequate remedy because the Attorney General may revoke it under certain circumstances. *See* 8 U.S.C. § 1158(b); 8 C.F.R. § 208.24. In pressing their argument, defendants relied on *Pangilinan* for the proposition that this Court lacked jurisdiction to provide Wang his requested remedy (an injunction barring his return to the PRC). The Court held that, in light of *Wauchope*'s interpretation of *Pangilinan,* defendants' argument went too far.

The Court did *not,* however, hold that *Wauchope* circumscribed the outer limits of the Court's jurisdictional power. Defendants' Rule 52(c) motion would rest on far stronger footing had the Supreme Court in *Pangilinan* held that the federal courts lack *all* power to remedy nonconstitutional violations except as Congress has authorized them to do so in the immigration laws. But that is not what the Court in *Pangilinan* held. Rather, the Court spoke to a narrow, but constitutionally significant, exercise of the federal courts' equitable authority: the power to confer *citizenship* upon an alien. It was the Ninth Circuit's exercise of this power that prompted the Supreme Court's holding, upon which defendants place so much reliance: "Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer *citizenship* in violation of [Congress'] limitations." 486

U.S. at 885, 108 S.Ct. at 2217 (emphasis added).

Wang does not ask the Court to grant him citizenship; he asks the Court to issue an injunction barring defendants from removing him from the United States or returning him to the PRC or its representatives. (First Am.Compl., filed July 5, 1990, at 44:23–27.) Wang seeks this remedy for *all* his causes of action, constitutional and nonconstitutional. (*Id.* ¶¶ 128 (third cause of action), 138 (fourth cause of action), 146 (fifth cause of action), 157 (sixth cause of action), 167 (seventh cause of action), 177 (eighth cause of action), 184 (ninth cause of action), 192 (tenth cause of action), 208 (twelfth cause of action).)

*Pangilinan* does not bar the federal courts from granting injunctive relief of the type Wang requests. Indeed, the following passage from that case appears to suggest the opposite: "[T]he power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers." 486 U.S. at 883–84, 108 S.Ct. at 2215–16. The Court noted that the federal courts' responsibility in exercising the naturalization power, which the Constitution, in the first instance, delegates to *Congress*, U.S. Const. art. I, § 8, cl. 4, must "be performed in strict compliance with the terms of an authorizing statute which says that '[a] person may be naturalized ... in the manner and under the conditions prescribed in this subchapter, *and not otherwise.*'" 486 U.S. at 884, 108 S.Ct. at 2216 (quoting 8 U.S.C. § 1421(d)) (alterations in original). The relief Wang seeks, a permanent injunction, is, as the *Pangilinan* Court stated, "one of [the federal courts'] generally applicable equitable powers." *Id.*

The Court, therefore, denies defendants' Rule 52(c) motion[25] and again holds that the INA's exhaustion provision does not deprive the Court of jurisdiction to hear Wang's claims.

### 2. *Political Questions Doctrine.*

■ Defendants also contend that the Court is without jurisdiction to consider Wang's claims because they concern matters committed to the political branches of the American government. The "political questions" doctrine is traced to Chief Justice Marshall's opinion in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–67, 2 L.Ed. 60 (1803). *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), sets forth the most complete statement of the political questions doctrine:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Defendants rely on the first of these bases for invoking the political questions doctrine: "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Id.*

Defendants cite *Mathews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976), for the unremarkable proposition that "the responsibility for regulating the rela-

---

**25.** The interplay between *Wauchope* and the Court's Memorandum Decision was relevant to defendants' Rule 52(c) motion for judgment on Wang's *nonconstitutional* causes of action. Defendants' Rule 52(c) motion also sought judgment as a matter of law with respect to Wang's constitutional causes of action (the third, eighth, and ninth in his first amended complaint). As discussed in Section B, *infra*, Wang's third cause of action is meritorious; obviously, defendants' Rule 52(c) motion with respect to that cause of action is specious and is denied. With respect to the eighth and ninth causes of action, those dealing with alleged constitutional violations in connection with 18 U.S.C. § 3508, the question is somewhat closer. Because the Court grants judgment to defendants on those two causes of action, *see* Sections G & H, *infra*, the Rule 52(c) motion becomes an academic point.

tionship between the United States and our alien visitors has been committed to the political branches of the Federal Government." That is quite true, but entirely beside the point, for Wang is not challenging the government's immigration policies with respect to aliens in general. Rather, he challenges the manner in which the government treated *him*, treatment that he alleges violated the Constitution.

This Court already has noted as much about the nature of Wang's claims: "In this case ... no especially sensitive political functions are at issue. Wang is suing for declaratory and injunctive relief based on the improper acts of United States government employees, albeit during a cooperative investigation with PRC officials, in securing his testimony at the *Leung* trial." (Opinion at 20:6–11 (internal quotation marks omitted).)

Defendants rely on *United States v. Alvarez–Machain*, —— U.S. ——, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), wherein the Court determined that a Mexican national who was forcibly kidnapped and brought to the United States to stand trial did not, by reason of the abduction, obtain a defense to the American court's jurisdiction over him. The Court grounded its holding on the conclusion that the extradition treaty between the United States and Mexico did not prohibit abductions, and the district court, consequently, had no reason to question the means by which the defendant was brought before it. *Id.* at ——, 112 S.Ct. at 2193–97. Defendants point to the Court's concession that the kidnapping might have been "shocking," and to the Court's subsequent rejoinder that if the kidnapping could be so described, the Mexican and American governments might have to deal with the political ramifications of the kidnapping outside the confines of an American courtroom. *Id.* at ——, 112 S.Ct. at 2196–97.

This brief discussion, which occupies the penultimate paragraph in the Court's opinion, is hardly the ringing endorsement of the political questions doctrine that defendants claim. As noted, the Court in *Alvarez–Ma-*

*chain* was concerned with a narrow question of treaty interpretation. The Court was not announcing a rule that allegations of "shocking" conduct involving foreign governments always constitute political questions.[26]

Accordingly, the Court holds that the political questions doctrine does not deprive the Court of jurisdiction over Wang's claims for relief. The Court now considers those claims in light of its Findings of Fact.

**B. Third Cause of Action: Violation of Substantive Due Process.**

Wang's third cause of action alleges a violation of his substantive due process rights under the Fifth Amendment. This cause of action is the cornerstone of Wang's first amended complaint, and the Court's discussion is, of necessity, quite detailed. At the outset, the parties disagree vigorously whether Wang may claim that his constitutional rights have been violated, because (1) many of the acts that Wang alleges violated his rights were taken while Wang was detained in the PRC, and (2) Wang is an alien presently in exclusion proceedings. The Court determines that neither of these facts prevents Wang from claiming a violation of his constitutional rights.

The Court then turns to the merits of Wang's substantive due process claim. For the reasons discussed below, Wang has demonstrated a violation of his constitutional rights.

**1. Wang's Constitutional Rights Apply to Conduct while He Was in the PRC and as an Alien.**

Defendants raise two threshold challenges to the Court's consideration of Wang's substantive due process claim. Their most sweeping assertion is that the Court may consider *none* of the allegedly unconstitutional acts that occurred while Wang was in the PRC (i.e., prior to December 27, 1989), because the Constitution did not apply to Wang so long as he remained outside the territorial boundaries of the United States. Next, defendants argue that because Wang is an alien who, under the immigration laws, has not

**26.** For similar reasons, defendants' reliance on *United States v. Verdugo–Urquidez*, 494 U.S. 259, 275, 110 S.Ct. 1056, 1066, 108 L.Ed.2d 222 (1990), in support of their political questions objection to the Court's jurisdiction also is misplaced.

effected "entry" into the United States, he may claim only the most limited constitutional protections. These arguments are considered in turn.

■ In support of their first argument, that Wang may claim *no* constitutional violation for the acts that occurred while he was in the PRC, defendants rely on *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). That case concerned the challenge of a criminal defendant (who was a Mexican citizen) to the introduction against him of certain evidence that DEA agents seized during the search of his residence in Mexico. The Court rejected the defendant's argument that the Fourth Amendment covered the search of his residence, because "[a]t the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico." *Id.* at 274–75, 110 S.Ct. at 1065.

The situation here, of course, is quite different. Wang does not complain of an isolated incident, such as his arrest, but rather of the *entire* American prosecutorial effort to bring him to this country, place him on the witness stand, and compel him to make an unconscionable choice between telling the truth and saving his own life. These actions did not occur on a single day, as did the search in *Verdugo–Urquidez*, but spanned a period of almost two years, at a minimum.[27]

The more fundamental problem with defendants' argument is that it would create a highly artificial line, one that would place beyond the federal courts' purview *any* actions taken prior to the time Wang arrived in the United States. Thus, defendants would have the Court turn a blind eye to any actions taken prior to December 27, 1989 (save, perhaps, actions taken during Wang's September 1988 trip to San Francisco). Many of those actions were taken *in the United States*, in contrast to the search in Mexico in *Verdugo–Urquidez*, and *all* of

those actions compounded the dilemma Wang faced when he took the witness stand in January 1990. Wang's constitutional claim centers on his allegation that when he arrived in San Francisco in December 1989, the wheels were irrevocably set in motion to produce the disastrous result that occurred when he testified.

The Court declines, therefore, defendants' invitation to ignore the prosecution team's actions prior to December 27, 1989. *Verdugo–Urquidez* does not control this case, and the Court will consider all of the prosecution team's actions in evaluating Wang's substantive due process claim.

■ Defendants' next argument is that, because Wang has not effected "entry" into the United States for purposes of the American immigration laws, he may claim only the most limited constitutional protection. Specifically, defendants argue that the Due Process Clause guarantees Wang only the right to be free from physical abuse at the hands of federal officials.

The cases upon which defendants rely for this proposition, however, are not on point. First, defendants cite *Jean v. Nelson*, 727 F.2d 957, 972 (11th Cir.1984) (*en banc* ), *aff'd on other grounds*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), in which the Eleventh Circuit rejected an equal protection challenge to the government's detention of Haitian aliens, holding that "excludable aliens cannot challenge either admission or parole decisions under a claim of constitutional right." Although the Supreme Court dismissed the *Jean* court's constitutional discussion,[28] *Jean* is not controlling for a more basic reason: the Eleventh Circuit was discussing an alien's constitutional rights *within the context of a challenge to the operation of the immigration laws.*

The INS had detained the *Jean* plaintiffs pending a final determination of their asylum applications. It refused to parole the plaintiffs into the country (and, thus, release them

---

**27.** When defendants' actions in connection with Wang's asylum proceedings are considered, the allegations of misconduct span almost *four* years.

**28.** On *certiorari*, the Supreme Court affirmed the decision of the *en banc* Eleventh Circuit, but did

so on narrow statutory grounds. 472 U.S. at 857, 105 S.Ct. at 2998. The Court held that the Eleventh Circuit had erred by reaching first to decide the Haitian aliens' constitutional challenge. *Id.* at 854–55, 105 S.Ct. at 2996–97.

from detention) until the asylum review was completed. *This* was the policy the *Jean* plaintiffs challenged as unconstitutional, a policy directly related to the administration of the immigration laws. The challenged policy was tied to the long-standing distinction the immigration laws make between aliens who have "entered" the United States and those who have not. The immigration laws provide more expansive procedural guarantees to aliens in the former category. *See Landon v. Plasencia,* 459 U.S. 21, 25–27, 103 S.Ct. 321, 325–326, 74 L.Ed.2d 21 (1982). The *Jean* plaintiffs were in the latter category; although the INS detained them at a detention center in southern Florida, the Haitian aliens had not effected "entry" into the United States.

It was against this backdrop that the Eleventh Circuit discussed the constitutional rights granted excludable aliens. The Eleventh Circuit observed that the Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Id.* at 32, 103 S.Ct. at 328. From this statement in *Landon,* the Eleventh Circuit reasoned that "[a]liens seeking admission to the United States ... have no constitutional rights with regard to their applications and must be content to accept whatever statutory rights and privileges they are granted by Congress." *Jean,* 727 F.2d at 968.

The *Jean* court's discussion of an alien's right to bring a constitutional challenge to an admission or parole decision appears, on its face, to be a sound one, but it has nothing whatsoever to do with Wang's challenge. Wang's constitutional claim does not "seek admission" to the United States; he requests no "privilege," and his claim infringes no "sovereign prerogative." True enough, Wang has filed an application for asylum with the INS, but he is "content to accept" the "statutory rights and privileges" Congress has granted him in the context of his INS proceedings. What Wang *does* challenge vis-a-vis his third cause of action are the actions certain government officials have

taken that are *wholly independent* of the immigration laws. For this reason, the Eleventh Circuit's discussion of the limitations on aliens' rights to bring constitutional claims does not bar Wang's substantive due process claim.

What is more, the Eleventh Circuit in *Jean* specifically recognized that, in certain circumstances, aliens (even excludable aliens) *are* entitled to the Constitution's substantive protections. Thus, the court noted that "[a]liens seized by United States officials for suspected involvement in criminal activity are entitled to the same constitutional rights that normally apply in such proceedings." *Id.* at 972 (citing *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896); *United States v. Henry,* 604 F.2d 908, 914 (5th Cir.1979)). Indeed, the Eleventh Circuit specifically distinguished *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931), which held that non-resident aliens may assert claims under the Fifth Amendment's Takings Clause, "because *it clearly does not implicate in any way the powers of the national government over immigration.*" *Jean,* 727 F.2d at 973 (emphasis added). Wang's substantive due process claim implicates certain powers of government officials. It does so in the same way that *any* substantive due process claim implicates those powers. Such a claim calls into question the officials' ability to take arbitrary actions that "shock the conscience." But Wang's substantive due process claim does *not* implicate the federal government's power over immigration.

This basic distinction, between a constitutional claim that implicates the sovereign's authority to control immigration and a claim that implicates no such interests, serves to distinguish the other cases that defendants cite. *Alvarez–Mendez v. Stock,* 941 F.2d 956, 963 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992), cites the Eleventh Circuit's *Jean* opinion in support of the rule that "[p]arole decisions are an integral part of the admissions process and excludable aliens cannot challenge such decisions as a matter of constitutional right." *Lynch v. Cannatella,* 810 F.2d 1363,

1374 (5th Cir.1987), holds "whatever due process rights excludable aliens may be denied by virtue of their status, *they are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials.*" (Emphasis added.)

Defendants would have the Court adopt the underscored language as the outer limit of substantive due process protections for excludable aliens. Indeed, defendants assert the Fifth Circuit has recently clarified that *Lynch* so held. The case defendants cite, *Gisbert v. U.S. Attorney General*, 988 F.2d 1437 (5th Cir.1993), does characterize the above-quoted holding in *Lynch* as providing a "narrow" substantive guarantee regarding the "humane treatment" the Constitution guarantees aliens while they are detained. *Id.* at 1442. *Gisbert*, however, is another case involving the government's power to detain aliens, i.e., a case that concerns the federal government's immigration powers. Consequently, the court's discussion has little relevance to Wang's constitutional claim, which is independent of the immigration laws.

Furthermore, *Gisbert*'s "narrowing" of *Lynch* was itself a narrow holding. The Fifth Circuit clarified that an alien's substantive due process right to humane treatment while in INS detention is limited to the right to be free from *"gross physical abuse." Id.* The right to humane treatment while in INS custody surely is not the *only* substantive right aliens enjoy; if it were, the case law granting aliens other rights, such as the constitutional protections afforded all individuals against serious crimes, would be nugatory. *See Wong Wing*, 163 U.S. at 238, 16 S.Ct. at 981.

In sum, the case law does not support defendants' sweeping assertion that the *only* substantive right Wang may claim is the right to be free from gross physical abuse while in American custody. Wang's substan-

tive due process claim does not implicate the federal government's sovereign prerogative to choose who will, and who will not, be permitted to enter the United States. Accordingly, the Court may consider that claim on the merits.

2. *Wang has the Right to be Free from Governmental Conduct that "Shocks the Conscience.*

" 'Substantive due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires [the federal courts] to exercise the utmost care whenever [they] are asked to break new ground in this field.' " *Reno v. Flores*, —— U.S. ——, ——, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993) (quoting *Collins v. City of Harker Heights*, —— U.S. ——, ——, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)) (first alteration in original). In this case, Wang asserts that governmental actors have violated his right to be free from governmental conduct that "shocks the conscience."

The "shocks the conscience" standard is derived from *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). In that case, the Court reversed a conviction obtained with evidence forcibly extracted from defendant's stomach by means of pumping his stomach. *Id.* at 166, 72 S.Ct. at 206. "While brutality by police or prison guards is one paradigmatic example of a substantive due process violation, it does not exhaust the possibilities." *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir.1989), *cert. denied*, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990).

■ Wang must do more, however, than demonstrate that the governmental conduct in this case "shocks the conscience." He has the additional burden of demonstrating that defendants acted with "gross negligence" or "recklessness." [29] *Redman v. County of San*

---

29. Defendants insist that the applicable standard is "deliberate indifference," the standard that governs Eighth Amendment conditions of confinement claims, *see Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), and the standard more recently adopted for so-called "failure to train" cases under 42

U.S.C. § 1983. *See City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). In *Redman*, the en banc Ninth Circuit stated that the panel opinion in *Fargo v. City of San Juan Bautista*, 857 F.2d 638 (9th Cir. 1988), *cert. denied*, —— U.S. ——, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992), had affirmatively re-

*Diego,* 942 F.2d 1435, 1440 n. 6 (9th Cir.1991) (*en banc*). "Gross negligence describes a greater want of care than is implied by ordinary negligence, and includes conduct evidencing the want of even scant care or an extreme departure from the ordinary standard of conduct." *Fargo v. City of San Juan Bautista,* 857 F.2d 638, 642 (9th Cir.1988) (citation and internal quotation marks omitted).

It is true that the "shocks the conscience" standard has been criticized by members of the Supreme Court since the time the standard first was announced. *See Rochin,* 342 U.S. at 175–77, 72 S.Ct. at 211–12 (Black, J., concurring); *Herrera v. Collins,* —— U.S. ——, ——, 113 S.Ct. 853, 874, 122 L.Ed.2d 203 (1993) (Scalia, J., concurring). *But see id.* at ——, 113 S.Ct. at at 870 (O'Connor, J., concurring); *id.* at ——, 113 S.Ct. at 876 (Blackmun, J., dissenting). The standard nevertheless retains vitality. *Wood,* 879 F.2d at 589. Ultimately, whatever trepidation the Court has about applying the "shocks the conscience" standard is obviated by this simple truth: under *any* formulation of the "judicial conscience," the governmental conduct in this case "shocks" it, and does so flagrantly. For the reasons expressed below, the Court finds that the governmental conduct with respect to Wang exceeds all constitutional norms. The Court also finds that the American officials involved acted, at the very least, with gross negligence to Wang's rights. Most, if not all, of their actions were taken with deliberate indifference to Wang's rights.

a. *The Government Acted With Deliberate Indifference to Wang's Rights.*

The term "predicament" hardly does justice to the circumstances that Wang faced on January 30, 1990, or the circumstances he

solved (at least in the Ninth Circuit) the question whether the "deliberate indifference" standard applies outside the prison context: *Fargo* held that it does not. *Id.* at 640–41.

Defendants correctly observe that *Fargo* had relied on yet another case, *Wood v. Ostrander,* 851 F.2d 1212 (9th Cir.1988), as support for its conclusion that "gross negligence" or "recklessness" is the applicable mental state. *Fargo,* 857 F.2d at 640. After the Supreme Court decided *City of Canton,* the Ninth Circuit heard reargument in *Wood* and issued a new opinion. *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), *cert. denied,*

faces today. On January 30, 1990, when he took the witness stand, Wang faced the "choice" of giving false testimony, thereby increasing the prospects he would receive leniency upon his return to the PRC, or testifying truthfully, and facing the harshest possible consequences back home. As detailed in the Findings of Fact, Wang took the latter course. Section II.G., *supra.* As a consequence of his "choice," Wang now faces unenviable prospects: if he returns to the PRC, he will be subjected to the harshest possible treatment; he most likely will be executed. Section II.I., *supra.*

The conduct of numerous American government officials with respect to Wang "shocks the conscience" because of the complete and total disregard to the warning signs that Wang would inevitably face in his present "predicament." From the inception of the Goldfish case, those officials ignored clear indications that the PRC police had coerced Wang's testimony, that the *Leung* defense counsel would exploit that fact, and that placing Wang on a witness stand in an American courtroom would force him to make an intolerable choice. From start to finish, the prosecution team, and Swenson, in particular, acted with complete indifference to the very real, and very obvious, threat of harm to Wang.

(i) *The Government Ignored Clear Indications that the PRC Police Coerced Parts of Wang's Testimony.*

 Swenson and Aiu first learned of Wang and his "testimony" in late March 1988, when they received the three interrogation minutes from Harris; they first considered using Wang as a witness in a criminal prosecution the following month. Section II. B., *supra.* Immediately upon reading those

498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). The second version of *Wood* does not explicitly resolve the question, but acknowledges that *City of Canton* cast doubt on the standard articulated in *Fargo. Id.* at 588.

Whatever the tension between *Fargo* and the second *Wood* opinion, this Court is bound to follow *Redman,* an en banc decision of the Ninth Circuit. Defendants refer to the cited portion of *Redman* as a "mistaken revivification" of *Fargo.* (Defs.' Post–Trial Br., filed May 25, 1993, at 12:9–10.) Clearly, this Court may not so easily dismiss binding Ninth Circuit authority.

minutes, Swenson, who from the first was the leader of the American prosecutorial effort, noticed the significant difference between the March 14 and March 19 minutes. Swenson specifically noted that Leung was *"not there,"* i.e., he was not at the scene of the heroin delivery, in the March 14 statement. (Ex. 3.) On one of the sets of March 19 minutes, Swenson underscored the interrogator's admonition, "after so many interrogations have been conducted on you." (Ex. 6.) Swenson's underscoring suggests that, from the earliest stages of the investigation, he recognized there had been a switch in Wang's testimony, from one that was less inculpatory of Leung to one that was more inculpatory of Leung. Swenson, at the outset of the investigation, considered the possibility that Wang had been mistreated by PRC police officials. Section II.B., *supra.*

Aiu also noticed the change in Wang's testimony. *Id.* He not only noticed it, but he made the connection between the change and his knowledge of the Chinese criminal justice system. Aiu thought it possible that the PRC police had coerced the change in Wang's story through the use of "unconventional" interrogation techniques. Aiu did not keep this concern to himself; he shared it with others in the DEA and, most significantly, with Swenson. *Id.*

Despite his concerns that the Chinese police might have mistreated Wang, and despite the unprecedented nature of cooperation with the Chinese, Swenson *never* discussed with his superiors, in either the United States Attorney's Office or the Department of Justice, the special precautions he might take before using a witness such as Wang in an American criminal trial.

Defendants argue that any concerns Swenson or Aiu might have had about Wang's treatment dissipated naturally after their face-to-face interviews with him. But it is difficult to see how any reasonable prosecutor or DEA agent possibly could permit the interviews that occurred in this case to dispel the very real evidence (reflected in the change in the interrogation minutes and the other knowledge the prosecution team obtained) that the PRC police had used (in Aiu's words) "unconventional" interrogation

techniques to produce more inculpatory testimony.

Swenson, Harris, and Aiu first met Wang "face-to-face" on May 19, 1988. Section II. C., *supra.* While it is true they observed no outward signs of mistreatment, it is equally true that the interview had all the elements of a staged performance. Wang sat in the middle of a large room, surrounded by the individuals who had coerced his testimony. Indeed, Aiu (the acknowledged leader of the questioning for the American side) thought it unusual that the Americans would interview Wang while he was surrounded by PRC police officials. *Id.*

But the most significant fact about the May 19, 1988, interview was that Wang did not stick exactly to the testimony reflected in the March 19, 1988, interrogation minutes. According to Aiu's DEA-6 summary of the interview, Wang had never before seen the men who delivered the heroin. (Ex. 51.) Although Aiu was surprised by this change, neither he nor any other member of the prosecution team was sufficiently surprised to raise the change with a PRC police official. Section II.C., *supra.*

Indeed, Aiu and Swenson *never* raised the issue of mistreatment or coercion with the PRC police officials. The reason for their oversight is clear: neither Aiu nor Swenson wanted to do *anything* that might jeopardize their prosecution. Swenson's concern that raising such issues would have been "very insulting," Section II.D., *supra,* is a legitimate concern for a diplomat; it is *not* the type of concern that a responsible prosecutor would allow to stand in his way of asking hard and unpleasant, but nevertheless extremely relevant, questions.

The *most* Swenson did in the way of seeking further information from PRC officials was to ask Harris to inquire about other PRC witness statements. (Ex. 81.) Defendants argue that Swenson acted reasonably when he relied on Harris' reply, "we got it all." Section II.E., *supra.* Swenson's actions hardly can be considered reasonable, given that he had learned some ten months earlier about the existence of a videotape of Wang being interrogated. Section II.C., *su-*

*pra.* What is more, the evidence shows that Swenson and Harris *did* discuss the videotape in February 1989, that they *did* agree that Harris would "check" on the status of the videotape, and that Harris proceeded to do *absolutely nothing* in the way of trying to obtain the videotape. (Ct.Ex. II.)

The evidence also demonstrates that officials on the American side recognized the vast differences in the nature of "consent" between the Chinese and the American systems. In August 1988, MPS officials indicated their understanding that in similar circumstances in the future, the American side would grant the Chinese "reciprocal" cooperation. (Ex. 60.) The Department of State informed the Embassy (which relayed the message to the Chinese) that "reciprocity," in the case of an *American* individual traveling to the PRC, simply could not be guaranteed. (Exs. 61, 66.) The principal reason for this failure to guarantee reciprocity was the Department of State's recognition that an American citizen would have to *consent* to go to the PRC. The American government quite obviously realized that the witness' "consent" was a nonissue for the Chinese: their witness (i.e., Wang) *had no choice* whether he would go to the United States.

Defendants make much of the fact that Wang's affidavit, which he executed in September 1988 before Magistrate Judge Langford, contained a statement of facts that was consistent with the March 19, 1988, interrogation minutes, i.e., the affidavit placed Leung at the scene of the heroin delivery. Section I.D, *supra.* But the consistency between the affidavit and the March 19, 1988, interrogation minutes does nothing to overcome the facts that (1) both statements conflicted with the March 14, 1988, interrogation minutes, which did *not* place Leung at the scene, and (2) no member of the prosecution team *ever* raised the inconsistency with Wang or any PRC official. As regards Wang's execution of the affidavit, the latter point is particularly egregious, given that Swenson and Aiu had *unlimited* access to Wang during his September 1988 trip to San Francisco. *Id.*

The final warning sign that Wang likely had changed his testimony in response to mistreatment came during the January 9, 1990, interview of Wang by *Leung* defense counsel. In response to defense counsel's questioning, Wang said he had been interrogated many times. Section II.G., *supra.* After this revelation, the PRC police officials produced additional statements, including one that referred to the "life and death significance" of Wang's responses. (Ex. 5.) After this and other statements were produced, however, Swenson did not ask Wang or the Chinese police whether Wang had been mistreated during his interrogations.

(ii) *The Government Attempted to Prevent the PRC from Transferring Wang to the Chinese Court System Until After He Testified in the United States.*

■ In April 1988, the prosecution team learned of the need to have the Chinese cooperate regarding the witnesses. Aloisi's April 26, 1988, cable alerted Aiu to the fact that, unless the United States asked the Chinese for assistance, the PRC witnesses, including Wang, would be transferred to the Chinese court system. (Ex. 41.)

Aiu and Swenson repeatedly raised with the MPS officials their eagerness to bring Wang to the United States to testify. Section II.C., *supra.* Indeed, at their final banquet with those officials during the May 1988 trip, Aiu represented to the PRC police that there was "no downside" to bringing Wang to the United States; Aiu called it a "win win" situation. *Id.*

In the fall of 1989, the MPS officials again told the prosecution team members that Wang's transfer to the Chinese court system was imminent. Section II.F., *supra.* In response, the American side formally requested that Wang be brought to the United States a month before he would testify. (Ex. 138.)

The Americans' active attempt to prevent Wang's transfer to the Chinese court system is significant because Wang already had done enough to earn leniency from those courts. Section II.I., *supra.*

(iii) *The Government Ignored the Problem of Using Wang as a Witness When Prosecution Was Declined in Hong Kong.*

■ During the earliest stages of the prosecutorial effort, the prosecution team

learned of Hong Kong's decision not to prosecute Leung for narcotics violations. Hong Kong reached this decision despite the fact that *everyone* involved—the Americans, the Chinese, and the Hong Kong Crown Counsel's Office—believed Leung to be the "mastermind" of the drug smuggling operation.

When Swenson visited Hong Kong in May 1988, he stayed at the home of Cunningham, a prosecutor in the Hong Kong Crown Counsel's office. During that entire stay, Swenson *never* asked Cunningham, or any other individual from the Crown Counsel's office, why Hong Kong decided not to prosecute Leung, despite the fact that Leung was in Hong Kong custody. Section II.C., *supra.*

Of course, all of the failures herein discussed pale in comparison to the evidence regarding Swenson and the McNair Memorandum. (Ex. 34.) As an initial matter, there can be no doubt as to the significance Swenson ascribed to that document: he knew that it outlined the Crown Counsel's reasons for not prosecuting Leung in Hong Kong. Swenson also knew, based on his experience as a prosecutor and Boucher's remark when he handed the McNair Memorandum to Swenson ("I shouldn't have these"), that it contained remarkably candid information regarding the perceived weaknesses of building a case against Leung. The same can be said of the Chandler and Findlay Memoranda, which Boucher also gave to Swenson. (Exs. 35, 37.)

The McNair Memorandum plainly refers to the possibility that Wang, the central witness against Leung, was mistreated during the course of his interrogations. The March 19, 1988, interrogation minutes referred to the numerous times Wang had been interrogated, a fact that caught the attention of both McNair *and* Swenson. Section II.E. n. 14, *supra.* More significant, however, is the reference in paragraph 16 to the videotape that Boucher had viewed:

16. However, *it seems to me,* with respect, *that the likelihood of conviction is small. I am unaware of the methods or circumstances surrounding the taking of [Wang's] confessions, however, a video tape has been supplied (and viewed by) Inspector Boucher, who tells me that a most peculiar posture was adopted by [Wang] throughout the confession, whereby the whole of his left side and left arm was hidden from the camera, as if his left arm and side may have suffered some injury.*

(Ex. 34 ¶ 16 (emphasis added).) The Court already has explained why Swenson's proffered explanation of his reaction to this paragraph (that it reminded him of the May 19, 1988, videotape the PRC police made during the American prosecution team's interview of Wang) is unworthy of credence. Section II. E., *supra.* The Court also has taken inventory of the actions Swenson took, or failed to take, after reading the McNair Memorandum. *Id.* Of these, the most damning is the fact that Swenson shared the McNair Memorandum with *no one;* he *buried* it in his files.

Defendants attempt to downplay the significance of the fact that Swenson secreted away the McNair Memorandum in his own files:

Nor should the McNair memorandum have changed [Swenson's] conclusions about Wang. First, the memorandum predates any of the face-to-face meetings with Wang. Second, McNair refers to a Hong Kong inspector's speculation that Wang's posture during an interview might have hidden an injury. Third, the memorandum is consistent with the views expressed orally to the DEA agents by Hong Kong authorities to the effect that Hong Kong declined to prosecute Leung because there was insufficient evidence in Hong Kong. Fourth, Hong Kong authorities encouraged the U.S. to extradite and prosecute Leung.

(Defs.' Post–Trial Reply Br., filed May 28, 1993, at 8:23–9:7 (citation omitted).) Each of these contentions does nothing to justify Swenson's behavior. That the McNair Memorandum was prepared before Swenson had three face-to-face meetings with Wang cannot justify Swenson's failure to try to find the videotape discussed in paragraph 16. The interview sessions of Wang that the *Leung* defense counsel were most likely to hammer away at during the criminal trial were not Swenson's interviews of Wang; the most important interview sessions, for pur-

poses of the attack on Wang's credibility that defense counsel promised to make, were those conducted by the *PRC police.*

Next, defendants attempt to justify Swenson's conduct based on their characterization (and his) of paragraph 16 as mere speculation, material that Swenson had no obligation to produce under the *Brady* doctrine.[30] Putting the *Brady* issue to one side for the moment, it is clear that Swenson's evaluation of paragraph 16 as speculation is not credible in the light of his actions and his knowledge. Swenson could not have dismissed the existence of the videotape as mere speculation, because *Boucher,* whom McNair mentions in paragraph 16 as the source of his information, told Swenson about the existence of a videotape. Furthermore, Swenson, just weeks before receiving the McNair Memorandum, had discussed with Harris the need to check on a missing videotape. Characterizing McNair's discussion of the possibility that Wang suffered an injury during the interrogation as "speculation" can be described, most charitably, as ignoring plain facts.

Defendants also argue that other portions of the McNair Memorandum supported the reasons Boucher gave Aiu for Hong Kong's decision not to prosecute Leung. Section II.C., *supra.* But this does not justify Swenson's decision to hide the McNair Memorandum; it only reveals that decision to have been all the more unreasonable. Swenson's myopic focus on only those facts that supported his attempt to build a successful prosecution against Leung smacks of deliberately ignoring *any* evidence that might stand in the way of that result.

Finally, defendants claim that Swenson acted reasonably with respect to the McNair Memorandum because Hong Kong encouraged the United States to extradite Leung. There are at least two problems with relying on that fact as a justification for Swenson's failure to do anything with the McNair Mem-

orandum. First, the fact that the Crown Counsel's office might have urged the United States to prosecute Leung does nothing to diminish this fact: McNair believed (and, judging by the accompanying memoranda, his supervisors agreed) that a case built on Wang's testimony would be perilous, to say the least, because of the strong likelihood that Wang had been mistreated. Second, the Chandler and Findlay Memoranda, which Swenson read at the same time he read the McNair Memorandum, echo McNair's concerns (e.g., Wang's "testifying as a result of the greatest possible inducement would almost inevitably lead to an acquittal" (Ex. 35), "returning [Wang] to—what?" (Ex. 37)), and express the view that Hong Kong should wash its hands of the whole affair.

To this point, the Court's discussion of Swenson and the McNair Memorandum has not assessed the relevance of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* doctrine clearly is relevant. Swenson's failure to produce the McNair Memorandum during discovery in *Leung,* his decision to bury the document in his files, was a flagrant *Brady* violation. "Under *Brady,* the prosecutor's withholding of evidence favorable to the accused violates due process where the evidence is material either to guilt or innocence. *Favorable evidence includes impeachment evidence." United States v. Brumel–Alvarez,* 991 F.2d 1452, 1461 (9th Cir.1992) (emphasis added) (citation omitted).

The *Leung* defense counsel made repeated requests for information related to the credibility of the PRC witnesses, including Wang. Section II.G., *supra.* The McNair Memorandum calls into question the reliability of Wang's confession. It contains a prosecutor's assessment that Wang would not make a good witness, and it contains information suggesting that the PRC police might have used physical force in obtaining Wang's

---

**30.** Swenson characterized his reaction in the following way:

> It [paragraph 16] told me nothing. It told me that a prosecutor in Hong Kong was making a statement at the end of a prosecution memo in which he was recommending that Hong Kong decline prosecution and was making what I

considered a throw-away statement to further justify not prosecuting the case; that he had heard that there was a tape with Mr. Wang in it in which he could only see one side of his body, and with a speculation of, well, maybe he had suffered some injury.

(Tr., Apr. 13, 1993, at 396:2–9.)

statements that were inculpatory of Leung. Had Swenson produced the McNair Memorandum to defense counsel, they surely would have used it to impeach Wang's credibility on the witness stand. Swenson's deliberate decision to share the McNair Memorandum with no one amounts to a *Brady* violation.

The Court emphasizes that this transgression is evidence of Swenson's misconduct toward *Wang.* Swensons' violation of his prosecutorial obligation did much more than threaten the due process rights of the *Leung* defendants: that violation was indicative of Swenson's tunnel vision approach to the winning his case, and it was responsible for placing Wang in the predicament he now faces.

### (iv). *The Government Deliberately Failed to Consider the Wang Videotape.*

█ Harris was the first prosecution team member to learn that PRC police had videotaped at least one interrogation of Wang. In April 1988, while at the offices of the Hong Kong police, Harris *actually watched* a portion of the videotape. Section II.B., *supra.* By his own admission, Harris did nothing to obtain a copy of the videotape: "I was not interested particularly in seeing it. It had no relevance to me at the time in terms of what I was trying to accomplish at the time." (Tr., Apr. 19, 1993, at 814:3–6.) Harris *again* was told about the videotape in August 1988, this time by Cahill of the Crown Counsel's office. Section II.D., *supra.* Again, Harris did nothing to obtain a copy of the videotape.

Swenson learned about the existence of a videotape a month later, during his May 1988 trip to Hong Kong. Like Harris, Swenson learned about the videotape vis-a-vis Boucher, the prosecution team's principal contact in Hong Kong. Also like Harris, Swenson did *nothing* to obtain a copy of the videotape. Section II.C., *supra.*

Harris and Swenson did not simply forget about the videotape of Wang's interrogations. In February 1989, shortly before Swenson again traveled to China and Hong Kong, he and Harris reviewed a list of items that needed to be followed up. Among these was the videotape of Wang's interrogation. (Ct. Ex. II.)

The videotape again became an issue when Swenson received and read the McNair Memorandum. (Ex. 34.) The Court already has discussed at length the magnitude of Swenson's misconduct in connection with the McNair Memorandum. The discussion need not be repeated here.

Swenson and Harris were not the only individuals on the American side who failed completely to follow up with the Chinese regarding requested information. Keith, the Embassy Narcotics Coordinator, received the March 1, 1989, DEA cable regarding the need to "impress[ ] upon the Chinese" the *Leung* defendants' right to obtain *all* witness statements. (Ex. AE.) Keith did *nothing* to follow up on this matter. Section II.E., *supra.*

### (v). *The Government Failed to Prepare PRC Officials for Cross–Examination.*

█ Swenson did not begin to prepare the PRC police officials for the conduct of the American trial until March 1989. On March 8, Swenson reviewed the concepts of sponsoring documents and evidentiary rules; he also reviewed, in very cursory fashion, the concept of cross-examination. *Id.* With regard to cross-examination, however, Swenson raised *only* the prospect that the *Leung* defense counsel would explore Wang's eligibility for the death penalty as a possible motive for lying. *Id.* Swenson, who was concerned about "insulting" the PRC police officials (i.e., not jeopardizing his case), did *not* raise the issues of coercion or mistreatment. *Id.*

Swenson also met with Wang that same day, March 8, 1989. Although Swenson discussed with Wang the prospect that the *Leung* defense counsel would explore inconsistencies between his recorded statements, Swenson did not in any way suggest to Wang that the *Leung* defense counsel might ask him whether he had been mistreated prior to making his statements. *Id.* Of course, if Swenson *had* raised the issue of mistreatment during the March 8, 1988, interview of Wang, the PRC police officials might have been alerted as well to the mistreatment issue and the likelihood it would come up at the criminal trial because Wang Qianrong

was translating between Swenson and Wang. *Id.*

Swenson's next attempt to prepare the PRC police officers for what they would face at trial was hardly more thorough. The list of questions he sent Harris on April 3, 1989, contained only one page that summarized the possible cross-examination of one PRC police officer. *Id.* & n. 17, *supra.* Swenson's final preparation of Wang took place on January 29, 1989, the day before Wang was scheduled to testify. Section II.G., *supra.* Again, Swenson failed to question Wang regarding his treatment or to alert him (or the MPS officers who accompanied Wang) that defense counsel might explore such questions on cross-examination. *Id.*

Of course, what renders the prosecution team's shortcomings at preparing Wang and the PRC officers for trial all the more egregious is the fact that the *Leung* defense counsel had given Swenson clear notice that they would hammer away at Wang's credibility. *Id.* During the September 1989 trip to Shanghai, Swenson had the opportunity to observe the PRC police officials' (in particular, Yuan's) insistence that *Leung* defense counsel avoid questions related to the PRC witness' credibility. Section I.F, *supra.* While Swenson did nothing to interrupt the questioning at that time, presumably because the questioning was taking place on Chinese soil, he had to have known that when the *Leung* defense counsel were questioning PRC witnesses, including Wang, in an *American* courtroom, the Court would allow more latitude in exploring issues related to credibility.

Had the prosecution team raised these issues with PRC officials, the Chinese government probably would have been far less likely to send Wang to the United States to testify. Of course, the members of the prosecution team *knew* that raising such issues would have that effect; that was the major reason they did not discuss these issues with the Chinese.

*(vi). The Government Deliberately Failed to Advise PRC Wang Could Apply for Asylum.*

The possible questions Wang and the PRC police officers would face on the

witness stand were not the only items the American side failed to mention to the Chinese. The Americans deliberately decided not to warn the Chinese of the prospect that Wang would apply for asylum.

Defendants do not dispute that the prosecution team and the DEA agents did nothing to alert their Chinese counterparts to the asylum issue. They claim American law enforcement officials left the matter to the diplomats in the Department of State. As noted, the diplomats also made a conscious decision not to discuss the matter with the Chinese. Defendants' "explanation" for the prosecutorial and diplomatic shortcomings is contained in the following sentence: "This issue was properly a political question left to the discretion of the State Department." (Defs.' Reply Trial Br., filed May 28, 1993, at 11:20–21.)

And just how did the Department of State exercise its "discretion" regarding this question? By delegating the decision whether to raise the asylum question to the Embassy in Beijing. (Ex. 61.) The Embassy's Narcotics Coordinator, Keith, made the conscious decision *not* to raise with the PRC the asylum question for *exactly* the reason Swenson and Aiu never raised with the PRC the mistreatment question: because doing so might cause the Chinese to rethink their decision to cooperate with the United States prosecutorial effort. Section II.D., *supra.*

When Wang did apply for asylum, Harris candidly stated Yuan and Wang Qianrong learned for the first time what had been the American side's attitude all along: that asylum was "the risk of the business." Section II.G., *supra.* From Wang's perspective, this shortcoming was far more than a business risk. His decision to apply for asylum in the United States has aggravated the Chinese government's displeasure with him and increased the chances that he will be treated harshly if he returns to the PRC. Section II.I., *supra.*

*(vii). Swenson Lied to the Court About His Knowledge of PRC Mistreatment of Wang.*

Further evidence of the shocking misconduct on the part of the prosecution

team comes from the numerous misrepresentations Swenson made to this Court. In March 1989, Swenson told the Court that the United States would make "a good faith effort to inquire" of PRC officials about the existence of *any* video or audio recordings, and would turn over the same to the *Leung* defense counsel. (Ex. 257.) Despite this representation, Swenson was content to rely on Harris' "we got it all" representation, without making *any* effort to follow-up on the request. Section II.E., *supra*. While Swenson's decision to rely on that representation might, in the absence of any other facts, have been a reasonable one, the decision is revealed to have been positively unreasonable by the fact that Swenson, ten months earlier, *had learned of a videotape* of Wang's interrogation. Section II.C., *supra*.

In May 1992, Swenson represented to the Court that he had "never, at any time, had any discussions with any United States government employees about any knowledge or suspicion of any mistreatment or torture of Wang Zong Xiao." (Ex. 301.) This was not true. Aiu had discussed with Swenson the possibility that the PRC police had used "unconventional" interrogation techniques on Wang. Section II.B., *supra*.

Swenson also told the Court that all rough notes maintained by prosecution team members had been saved and would be produced. (Ex. 306.) For his own part, however, Swenson did nothing to encourage or direct Aiu to preserve his handwritten notes from the May 19, 1988, interview of Wang. Section II.C. n. 8, *supra*. The Court already has noted several other examples of similar misrepresentations. *See* Section II.E. n. 15, *supra*.

Swenson's most blatant misrepresentation to the Court came after Boucher testified about the existence of a videotape of Wang's interrogation. Swenson, who had been told in May 1988 *by Boucher* that such a videotape existed, who had discussed with Harris in February 1989 the need to check for a videotape, and who had, in March 1989, read paragraph 16 of the McNair Memorandum, represented to the Court, "I don't know about any video." Section II.G., *supra*. This was nothing less than an outright falsehood.

(viii). *After Wang Testified, Swenson Tried to Cover Up His Failings in the Case.*

■ Wang's January 30, 1990, colloquy with the Court set into motion a series of events demonstrating that Swenson recognized the folly of using Wang as a witness and that he wanted to cover up his errors. First, Swenson directed the Marshals Service bring Wang to his office, where Yuan proceeded to berate Wang. Section II.G., *supra*. This was a clear violation of the Court's order that the Marshals Service should keep Wang in the holding cell while the Court attempted to secure counsel for him. *Id.* Swenson actively attempted to dissuade Wang from pursuing his request to the Court, telling him "you don't need a lawyer, because I'm your lawyer." *Id.* Nothing could have been further from the truth: Swenson *never* had Wang's interests or safety in mind; he was concerned only with the strength of the case against the Goldfish defendants.

On February 7, 1990, after the Court had appointed counsel for Wang, Swenson interfered with the attorney-client relationship by meeting alone with Wang, over Chao and Portman's objections. *Id.* Swenson also rebuked Eisenberg's attempt to secure the presence of Yuan and Wang Qianrong for the remainder of the Goldfish trial. He told Eisenberg that the two police officers had departed the country, a representation clearly belied by Swenson's subsequent telephone call to the Chinese consulate to confirm dinner arrangements with the officers. *Id.*

Finally, there is the matter of Swenson's attempt to interfere with Wang's asylum proceedings. On the day Wang filed his asylum application, February 5, 1990, Swenson suggested to Rice that 18 U.S.C. § 3508 might apply to Wang, and hence, might be sufficient to reject his asylum application. Section II.H., *supra*. Swenson and Snow had discussed § 3508 three or four days earlier; they did so in an obvious attempt to find a means for short-circuiting Wang's anticipated asylum application. *Id.*

(ix). *INS Tried to Derail Wang's Asylum Application.*

■ After Swenson stopped interfering with Wang's attempt to obtain asylum, indi-

viduals employed by the INS began taking steps to ensure that the application would fail. Rice requested from the Bureau an advisory opinion on the application *one day* after Wang filed it. *Id.* The District Director himself took a role in interviewing Wang. *Id.*

When it came to preparing the denial of asylum, Rosenberg, the number-two individual in the INS' legal division in San Francisco, participated in the process. *Id.* Rosenberg's supervisor, Le Fevre, took the unusual, and unorthodox, step of attempting to secure a hearing date for Wang's initial exclusion proceedings. *Id.* Finally, INS officials took every step possible to ensure that Wang's proceedings would be assigned to an Immigration Judge known to the INS officials to have developed a reputation (whether deserved or not) as progovernment in asylum matters. *Id.*

When viewed in isolation, each of the actions by INS officials appears suspicious. In concert, however, those actions take on all the appearance of an attempt to railroad Wang's asylum application.

b. *Actions of the Government "Shocks The Conscience" of the Court.*

Summarizing, the numerous instances of invidiously egregious conduct of important officials of the United States government shocks the conscience of the Court and deprives Wang of the substantive due process to which he is entitled. Such conduct includes the tissue of outrageous lies to the Court concerning evidence pivotal to Wang's testimony; the deliberate concealment of the McNair Memorandum from *Leung* defense counsel; the false promise that the government would make a good-faith effort to obtain interrogation documents from the PRC; the deliberate lie that the government prosecutor made denying that he had ever heard of any video being taken of Wang; the policy of willful ignorance towards all evidence tending to show that "unconventional" interrogation tactics had prompted a switch in Wang's story; the request to delay Wang's transfer to the jurisdiction of the Chinese courts, thereby depriving Wang of the possibility of leniency before the Chinese courts; the decision not to tell appropriate members

of the PRC about the possibility that Wang might seek asylum, for the sole reason that the PRC officials might not cooperate in the Goldfish prosecution; the actions of the government prosecutor in trying to dissuade Wang from seeking representation from counsel by representing to Wang, falsely, that the government prosecutor was representing Wang's best interests; the officious intermeddling by members of the Department of State and the INS with Wang's application for asylum, including notifying PRC officials before the proceeding even commenced that Wang's application would be denied, and "judge-shopping" in an attempt to have Wang's asylum case heard by an immigration judge with a "progovernment" reputation.

All of these actions forced Wang to make a Hobson's choice: whether to abide by his oath in the American court to tell the truth on the witness stand, and thereby face near certain execution in the PRC, or to lie under oath in the American court and receive leniency in the PRC. The preceding summary of the actions of the United States government leaves no doubt that these actions individually and collectively shock the conscience of the Court and deprive Wang of the substantive due process to which he is entitled.

C. *Fourth Cause of Action: Violation of the Government's Duty to Protect Its Witnesses.*

Wang's fourth cause of action alleges that the government breached its obligation to protect its witness. The Court already has determined that Wang may appeal to it to exercise its inherent supervisory power to protect Wang, a witness appearing before the Court, "because Wang assisted the prosecutor, has demanded protection, and is in threat of harm if that request is not honored." (Opinion at 13:24–25.) The Court is mindful of the Ninth Circuit's admonition "that the supervisory power must be exercised with circumspection." *Wang Zong Xiao,* 979 F.2d at 156 (internal quotation marks omitted). What is more, "[t]he supervisory power simply does not give the courts the authority to make up the rules as they go, imposing limits on the executive accord-

ing to whim or will." *United States v. Simpson,* 927 F.2d 1088, 1090 (9th Cir.1991).

■ Where, however, the governmental conduct in issue violates due process, a federal court *has* the authority to exercise the supervisory power. *Id.*

In a situation like this, *the judiciary— especially the court before which the primary misbehavior took place—may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was· more serious still and that steps must be taken to avoid a recurrence of this chain of events.*

*United States v. Kojayan,* 8 F.3d 1315, 1325 (9th Cir.1993) (emphasis added). For the reasons discussed in Section B, *supra,* Wang has demonstrated that the United States government violated his right to substantive due process. Accordingly, the Court has the authority to exercise its supervisory powers.

■ The Court already has determined that *Miller v. United States,* 561 F.Supp. 1129 (E.D.Pa.1983), *aff'd,* 729 F.2d 1448 (3d Cir.1984) (table), sets forth the applicable standards for evaluating a claim that the government has breached its duty to protect its witnesses. (*See* Opinion at 14:14–23.) *Miller* outlines those standards as follows:

(1) the police solicited information from the plaintiff; (2) the plaintiff aided the government by giving information; (3) the government *knew or should have known that the plaintiff was in danger because he provided the government with information.*

561 F.Supp. at 1135 (emphasis added). There is no dispute regarding Wang's ability to satisfy the first two of these requirements. The Court's analysis of Wang's substantive due process claim applies with full force to the third element: the United States government, and the prosecution team in particular, acted with gross negligence, and in many instances with deliberate indifference, to the risk to Wang from his testifying in an American courtroom.

For these reasons, Wang is entitled to judgment on his fourth cause of action.

### D. Fifth Cause of Action: Failure to Use Ordinary Care.

■ Wang's fifth cause of action alleges the government failed to use ordinary care in its conduct toward him. In short, this is a common law negligence claim.

The Federal Tort Claims Act ("FTCA") authorizes common law negligence suits against the United States. 28 U.S.C. § 1346(b). The FTCA, however, presents a problem for Wang, because that statute authorizes only *monetary* relief. *Id.; Moon v. Takisaki,* 501 F.2d 389, 390 (9th Cir.1974) (*per curiam* ) ("[T]he [FTCA] does not submit the United States to injunctive relief."). Wang seeks injunctive relief. (First Am. Compl., ¶ 146.) Defendants argue the Court is without jurisdiction to consider Wang's negligence claim.[31]

Wang insists that his negligence claim rests on § 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which contains "an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable." *Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518, 525 (9th Cir.1989). The APA, however, allows for judicial review only of "final" agency actions. 5 U.S.C. § 704. As Wang is presently pursuing his administrative remedies under the INA, the APA does not provide the Court with jurisdiction to consider his negligence claim.

Because the Court is without jurisdiction to consider Wang's fifth cause of action, defendants are entitled to judgment on that claim.

### E. Sixth Cause of Action: Equitable Estoppel Based on Affirmative Governmental Misconduct.

■ Wang's sixth cause of action is for equitable estoppel based on the governmental misconduct in this case. The Court initially confronts the question: what does Wang wish the Court to estop defendants from doing? Wang offers two suggestions.

**31.** Notwithstanding Wang's arguments to the contrary, defendants have not (and cannot) waive their jurisdictional objections to this cause of action. *See* Fed.R.Civ.P. 12(h)(3).

First, he asserts defendants should be barred from asserting that Wang consented to come to the United States. (*See* Pl.'s Post–Trial Br., filed May 25, 1993, at 102:6–9.) The Court, however, has determined that Wang did *not* consent to come to the United States to testify. Section II.I., *supra.* It is meaningless to speak of "consent" with respect to Wang, because the decision as to whether he would come to the United States rested with the PRC police officials. *Id.*

Second, Wang argues the Court should estop the government from returning Wang to the PRC. There is little doubt that if Wang were subject to a final order of exclusion, the facts of this case would satisfy the controlling six-factor test for the exercise of equitable estoppel. *Watkins v. United States Army,* 875 F.2d 699, 706–09 (9th Cir. 1989) (*en banc*), *cert. denied,* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). The problem for Wang is that, at the present time, there is no government action to estop; the INS denied Wang's petition for asylum (Ex. 345) and placed him in exclusion proceedings (Ex. 354, 355), but Wang is challenging the INS' asylum ruling in the EOIR. Hence, *Villena v. INS,* 622 F.2d 1352 (9th Cir.1980) (*en banc*), upon which Wang relies, is not on point; the alien in that case had exhausted his administrative remedies under the INA. *Id.* at 1356.

Of course, if Wang exhausts his administrative remedies and fails to get relief from that process, he may again raise his equitable estoppel claim in connection with a petition for habeas corpus. 8 U.S.C. § 1105a(b). With that important caveat, the Court grants judgment to defendants on Wang's sixth cause of action.

F. *Seventh Cause of Action: Violation of 18 U.S.C. § 3508.*

Wang's seventh cause of action alleges that defendants violated 18 U.S.C. § 3508, insofar as they failed to obtain Wang's consent to travel to the United States. Section 3508 provides as follows:

(a) When the testimony of a person who is serving a sentence, is in pretrial detention, or is otherwise being held in custody, in a foreign country, is needed in a State or Federal criminal proceeding, the Attorney General shall, when he deems it appropriate in the exercise of his discretion, have the authority to request the temporary transfer of that person to the United States for the purposes of giving such testimony, to transport such person to the United States in custody, to maintain the custody of such person while he is in the United States, and to return such person to the foreign country.

(b) Where the transfer to the United States of a person in custody for the purposes of giving testimony is provided for by treaty or convention, by this section, or both, that person shall be returned to the foreign country from which he is transferred. *In no event shall the return of such person require any request for extradition or extradition proceedings, or proceedings under the immigration laws.*

(c) Where there is a treaty or convention between the United States and the foreign country in which the witness is being held in custody which provides for the transfer, custody and return of such witnesses, the terms and conditions of that treaty shall apply. *Where there is no such treaty or convention, the Attorney General may exercise the authority described in paragraph (a) if both the foreign country and the witness give their consent.*

18 U.S.C. § 3508 (emphasis added). Wang, relying on the last sentence of subsection (c), insists that because the United States and China did not maintain a treaty or convention authorizing his transfer, the United States was obligated to obtain his consent prior to bringing him to San Francisco for purposes of giving testimony. Wang argues that the evidence shows that the United States did not obtain his informed consent to travel here for that purpose.

This cause of action is contingent upon § 3508 being the exclusive means by which an individual in foreign custody may be brought to the United States to testify in a criminal proceeding. The evidence conclusively demonstrates that the United States brought Wang to San Francisco, both in September 1988 and in December 1989, pursuant to the INA's parole provision. Sections II.D.

& II.G., *supra.* The parole statute provides in pertinent part:

> The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). Because the American government brought Wang to the United States pursuant to the parole statute, Wang can prevail on his seventh cause of action only if he can demonstrate that § 3508 is the *exclusive* means by which the government could bring him here. Wang has failed to make such a showing.

"The courts are not at liberty to pick and choose among congressional enactments, and *when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.*" *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (emphasis added). Wang can point to no "clearly expressed congressional intention," either on the face of § 3508 or in its legislative history, that § 3508 supplant the parole statute in cases involving witnesses for criminal prosecutions.

Accordingly, defendants are entitled to judgment on Wang's seventh cause of action.

### G. Eighth Cause of Action: As Applied Violation of Procedural Due Process.

Wang's eighth cause of action alleges that defendants violated Wang's right to procedural due process by failing adequately to obtain his consent under 18 U.S.C. § 3508.

For the reasons discussed in Section F, *supra,* the Court finds that the American government brought Wang to the United States pursuant to the INA's parole provision. 8 U.S.C. § 1182(d)(5)(A). Defendants are entitled to judgment on Wang's eighth cause of action.

### H. Ninth Cause of Action: Facial Violation of Procedural Due Process.

Wang's ninth cause of action alleges that 18 U.S.C. § 3508 can *never* be applied, consistently with procedural due process, to a witness coming from the PRC. Wang argues there are *no* procedural safeguards that can guarantee adequately that such a witness has provided informed consent to travel to the United States.

For the reasons discussed in Section F, *supra,* the Court finds that the American government brought Wang to the United States pursuant to the INA's parole provision. 8 U.S.C. § 1182(d)(5)(A). Defendants are entitled to judgment on Wang's ninth cause of action.

### I. Tenth Cause of Action: Violation of 8 U.S.C. § 1182.

Wang's tenth cause of action alleges that the government violated the INA's parole provision, 8 U.S.C. § 1182(d)(5)(A), when it brought Wang to the United States. That provision, which is quoted in full in Section F, *supra,* speaks of "any alien applying for admission to the United States." Wang claims that, because he never applied for admission to this country, the government violated the plain language of § 1182(d)(5)(A) when it used the parole statute to bring him here.

Wang's argument rests on the premise that "applying for admission," as it appears in the INA, requires some volitional act on the alien's part, *viz.,* making a formal application for entry. "Applying for admission" is a term of art in the INA. It refers to the alien's presence at the border of the United States, not to her or his subjective wish to come here. *See Clark v. Smith,* 967 F.2d 1329, 1331–32 (9th Cir.1992); *Matter of Accardi,* 14 I. & N. Dec. 367, 369 (BIA 1973). Accordingly, the government did not violate § 1182(d)(5)(A) by paroling Wang into the United States without his consent.

■ Wang next argues that if the government complied with § 1182(d)(5)(A) in bringing him to the United States without his consent, then the statute violates Wang's procedural due process rights. He insists that his "as applied" procedural due process arguments with respect to 18 U.S.C. § 3508, *see* Section G, *supra*, apply with full force to the INA's parole provision. (*See* Pl.'s Post–Trial Br. at 97:21–101:24.)

Wang's constitutional challenge to the parole statute encounters head on the jurisdictional obstacles discussed in Section B.1, *supra*. Unlike his *substantive* due process cause of action, Wang's *procedural* due process challenge implicates directly the structure and administration of the immigration laws. "Parole decisions are an integral part of the admissions process and excludable aliens cannot challenge such decisions as a matter of constitutional right." *Alvarez–Mendez*, 941 F.2d at 963.

Accordingly, the Court is without jurisdiction to consider Wang's procedural due process challenge to the INA's parole provision, and defendants are entitled to judgment on Wang's tenth cause of action.

### J. Twelfth Cause of Action: Violation of the Law of Nations and International Law.

■ Wang's twelfth cause of action alleges that the government's attempts to return him to the PRC violate the law of nations and international law. Wang argues that, because the renunciation of torture is an international norm, and because he faces certain torture and probable execution if the United States returns him to the PRC, he should prevail on this claim.

Defendants argue the Court lacks jurisdiction to consider Wang's twelfth cause of action. Wang asserts that the Court has jurisdiction to consider this claim under the Alien Tort Statute, 28 U.S.C. § 1350, which grants to the district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." But "[t]he Alien Tort Statute itself is not a waiver of sovereign immunity." *Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C.Cir.1985); see also *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir.1992).

Wang agrees that the Alien Tort Statute does not waive sovereign immunity, but repeats his argument that the Court has jurisdiction because § 702 of the APA is a waiver of the government's sovereign immunity. Then–Judge Scalia, writing for the court of appeals in *Sanchez–Espinoza*, suggested that § 702 was "arguably available" as a waiver of sovereign immunity for the plaintiffs' non-monetary claims, 770 F.2d at 207, but resolved the jurisdictional issue on other grounds. *Id.* at 208.

The Court already has determined that § 702 does not avail Wang, because he is not seeking (and, at this point, cannot seek) relief under the APA. *See* Section D, *supra*. That determination compels the Court to hold that the government has not waived its sovereign immunity with respect to Wang's twelfth cause of action. Accordingly, defendants are entitled to judgment on that claim.

### K. Remedy.

■ Finally, there is the question of the appropriate remedy the Court should grant Wang on his third and fourth causes of action. Wang asks the Court to "permanently enjoin defendants from taking any action in furtherance of removing [him] from the jurisdiction of the United States or of returning [him] to the custody of China or any representative of China." (First Am. Compl. at 44:23–27.)

The Court recognizes that an injunction of the type Wang requests is extraordinary in scope and effect. In this case, however, this injunction is the only relief adequate to cure the flagrant violations of Wang's rights. There is no middle ground here. If the Court does not invoke its equitable powers to remedy the constitutional abuses discussed herein, Wang will receive the harshest possible treatment upon his return to the PRC; in all likelihood, the Chinese government will execute him for his attempt to vindicate his constitutional rights in this country. Section II.I., *supra*.

Defendants make no attempt to suggest an alternative remedy. The most they have done is to submit the Perito letter. (Ex.

BG.) As the Court has found, however, neither the Perito letter nor any other diplomatic request from the United States government will alter the prospect that the Chinese government will treat Wang with extreme harshness if he returns to China. Section II.I., *supra.*

The magnitude of the constitutional violations in this case is extraordinary. The threat of physical harm to Wang in the absence of injunctive relief is extraordinary. Extraordinary circumstances justify an extraordinary remedy. Wang is entitled to the injunction he requests.

## IV. *ORDER.*

For all of the foregoing reasons,

IT IS HEREBY ORDERED that:

1. Defendants' motion for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure is DENIED.

2. Judgment is granted to defendants on Wang's first, second, fifth, sixth, seventh, eighth, ninth, tenth, and twelfth causes of action.

3. Judgment is granted to Wang on his third and fourth causes of action.

4. Defendants are permanently enjoined from taking any action in furtherance of removing Wang from the jurisdiction of the United States or of returning him to the custody of the PRC or any of its representatives.